# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2180

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

BRYANT J. KING,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 01 CR 12—**William C. Lee**, *Judge.*

_____

ARGUED DECEMBER 5, 2003—DECIDED JANUARY 28, 2004

_____

Before FLAUM, *Chief Judge*, and MANION and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Bryant J. King was convicted of distributing more than 50 grams, but less than 500 grams, of a mixture containing methamphetamine in violation of 21 U.S.C. § 841(a)(1). The district court sentenced King to 262 months' imprisonment to be followed by five years of supervised release. On appeal King challenges the district court's denial of his request for government funds to retain a fingerprint expert, the sufficiency of the evidence against him, and the calculation of his sentence. We affirm.

**I.**

On January 29, 2001, members of the Fort Wayne, Indiana Police Department arrested King immediately after he sold $5,000 worth of methamphetamine to undercover police detective Steven Espinoza. Espinoza had arranged the sale with the help of Charles Dominguez, a confidential informant. Dominguez arranged for the sale to take place at a gas station, drove Espinoza to the gas station, and was present during the sale, which took place in the back seat of Dominguez's car.

Members of a police surveillance team, who had witnessed the transaction and heard details of the sale through a listening device, arrested King after he returned to his car. A search of King and the car revealed $1,000 on his person and $4,000 on the driver's side floorboard. The recovered currency was pre-recorded money Espinoza used to purchase the drugs. In the passenger seat of King's car when he was arrested was Aaron Montgomery. Montgomery was questioned by the police and later released.

After King was arrested, the drugs he sold to Espinoza were field-tested (the test was positive for methamphetamine), photographed, and sealed in an evidence bag. Neither the drugs nor the bags the drugs were sold in were fingerprinted. Espinoza transferred the drugs to Scott Criswell, a detective with the Fort Wayne Police Department who also served as a member of a Drug Enforcement Administration ("DEA") task force. Criswell then transferred the evidence bag to a drop box where the bag was retrieved by an evidence technician and placed in an evidence custody room until Criswell took back the bag and mailed it to a DEA lab for analysis.

At the lab, Odiest Washington, a DEA forensic chemist, received the drugs and tested them. Washington accom-

plished this by reducing the drugs to a powder (the drugs had previously been in chunks) and testing a portion (25 grams) of the powder. Washington's test confirmed that the powder was, in fact, a mixture containing methamphetamine.

In preparation for trial, King initially pursued a theory that he had been entrapped by Montgomery and Dominguez as agents of the government. In order to pursue this theory, King requested that the court approve the expenditure of public funds so that King could retain an audio expert. King asserted that a tape recording of phone calls between Dominguez and King arranging the sale had been edited to eliminate Montgomery's voice from the conversation. The court approved King's request.

In a September 2001 status conference, King's attorney reported to the court that tests of the tape recording did not find any indication that a voice had been edited out of the recording. King's attorney, however, requested a second expert be retained to conduct a test of the tape. Over the government's objection, the court agreed to a second test.

A week after the request for a second audio expert, King also requested a fingerprint expert to determine if Dominguez's fingerprints would be found on the drugs or on the bags in which they were sold. The court suggested that the Fort Wayne Police Department or the Indiana State Police could conduct the test for free. King rejected this idea. The court, therefore, took the motion under advisement and directed King to file a petition setting forth the exact services and the costs. King never filed this petition.

In February 2002, King's attorney reported to the court that the second audio analysis had not detected any doctoring of the tape. As a result, in March 2002, the court denied King's motion to suppress the tape. Shortly after the

suppression ruling, King filed a *pro se* motion alleging ineffective assistance of counsel. The court treated this motion as a motion for new counsel and appointed new counsel for King.

At about this time, King's defense theory changed. Rather than assert that, although he sold the drugs to Espinoza, he was the victim of an entrapment involving Dominguez and Montgomery, King's new theory (and the theory he presented at trial) was that Montgomery, not he, was the person who sold the drugs to Espinoza. To help corroborate this theory, King's new attorney adopted the outstanding request for a fingerprint expert. This time, however, the purpose of the test was to show that King's fingerprints were not on the drugs. The court denied this request. The court pointed out, however, that King could argue to the jury that no fingerprint test was ever conducted and the implications of the absence of such a test.

After a two-day trial, a jury found King guilty of distributing more than 50 grams, but less than 500 grams, of a mixture containing methamphetamine. At sentencing, the court first determined that King's initial sentence level under federal sentencing guidelines was 26, based on the weight of the methamphetamine being approximately 142 grams. The court then increased the sentence level by two for obstruction of justice based on what the court considered King's perjurious testimony at trial that he was not the person who purchased the drugs from Espinoza, and for pursuing a "wholly spurious" issue related to the tape which resulted in an unnecessary expenditure of public funds. Finally, the court set King's sentence level at 34 because of a previous burglary conviction. The judge sentenced King to 262 months' imprisonment, the lowest end of the sentencing range, and five years of supervised release. This appeal followed.

## II.

King raises three issues on appeal. First, King argues that the district court abused its discretion when it denied his request for a fingerprint expert. Second, King claims that the government did not present sufficient evidence to support his conviction. Specifically, King argues that the evidence was insufficient due to a break in the chain of custody, discrepancies in the weight of the drug evidence, and that DEA chemist Washington's testimony was vague and should not have been relied upon by the jury. Finally, King argues that the district court erred in calculating his sentence by improperly determining the amount of drugs involved and by enhancing his sentence because of obstruction of justice.

### A. Retention of a Fingerprint Expert

King first challenges the district court's decision to deny his request to hire an expert to conduct a fingerprint test on the drugs. King argues that it was Montgomery who sold the drugs, and a fingerprint test of the drugs would corroborate this theory of defense if his prints were not on the drug packages. The government responds that King's request was frivolous because, given the overwhelming audio and eyewitness evidence, a fingerprint analyst would not have contributed to a plausible defense.

Title 18 of the United States Code, section 3006A(e)(1) governs the funding by the government of expert services for indigent criminal defendants.

> Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate

> inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1). The government does not challenge King's assertion that he is indigent and thus unable to afford expert services.

This court reviews a decision to grant or deny a request for expert services for an abuse of discretion. *United States v. Cravens*, 275 F.3d 637, 639 (7th Cir. 2001). The test for whether expert services should be provided is "whether a reasonable attorney would engage such services for a client having the independent financial means to pay for them." *United States v. Alden*, 767 F.2d 314, 318 (7th Cir. 1984). This court has recognized, however, that this standard, if applied too literally, could result in the government being forced to finance a "fishing expedition." *Id.* As a result, this court has held that "it is appropriate for the district court to satisfy itself that a defendant may have a plausible defense before granting the defendant's section 3006A(e) motion." *Id., quoted in Cravens*, 275 F.3d at 639. Other circuits have also adopted this "plausible defense" requirement. *See United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002); *United States v. Roman*, 121 F.3d 136, 143 (3d Cir. 1997).

The district court did not abuse its discretion in denying King's request for a fingerprint analysis. King did not have a plausible defense that would have made a fingerprint analysis necessary. The evidence that King sold Espinoza methamphetamine is overwhelming. Espinoza personally purchased the drugs from King. King's approach to Dominguez's car and his return to his car after the sale were

observed by a police surveillance team that also overheard the details of the sale through a listening device. King was arrested immediately after the sale with the proceeds (pre-recorded money) of the sale on his person and at his feet. Neither King's brief nor the record calls into question Espinoza or the surveillance team's version of events. Furthermore, audio tapes of King arranging the drug sale were also made. The district court did not abuse its discretion when it refused to require the government to finance a fingerprint expert, particularly after the government had already financed two separate expert analyses of the audio tapes to bolster an earlier theory that King had sold the drugs but had been entrapped. Also, King's attorney rejected the court's initial suggestion that the police conduct a fingerprint analysis for free. We agree that the test would not have contributed to a plausible defense. King's request appears to have been the classic fishing expedition and the government need not have financed it.

### B.  The Sufficiency of the Evidence

King next challenges the sufficiency of the evidence presented by the government for his conviction. King makes three specific challenges to the evidence. First, King argues that there was a break in the chain of custody of the drugs. Second, King argues that Washington's testimony concerning the testing of the drugs was vague and should not have been relied upon. Third, King seizes on what he suggests are material discrepancies in the weight of the drugs weighed by Espinoza in Fort Wayne and the amount of drugs weighed by Washington at the DEA labs.

A defendant challenging the sufficiency of evidence "faces a 'nearly insurmountable hurdle.' " *United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir. 1996) (quoting *United States v.*

*Teague*, 956 F.2d 1427, 1433 (7th Cir. 1992)). Evidence of a conviction is viewed in the light most favorable to the government and this court will overturn a conviction " '[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.' " *Id.* King was found guilty of distributing more than 50 grams, but less than 500 grams, of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1). The three elements the government had to prove beyond a reasonable doubt were: (1) that the defendant distributed methamphetamine; (2) that the defendant did so knowingly or intentionally; and (3) that the defendant knew that the substance was a controlled substance.

There was sufficient evidence to support King's conviction. As recounted above, the government provided testimony that King sold drugs to an undercover police officer. This sale was overheard by police officers who observed King approach and exit the car where the sale took place. King was arrested minutes later with the proceeds of the sale on his person and at his feet. With respect to King's argument concerning the chain of custody, the testimony of Espinoza, Criswell and Washington establishes an unbroken chain of custody. Without any evidence of tampering or other interference, there is a presumption of regularity when evidence is within official custody. *See United States v. Boykins*, 9 F.3d 1278, 1285 (7th Cir. 1993). Even assuming there was some sort of break in the chain, such a break would not go to the admissibility of the drugs as evidence, only to the weight of the evidence. *Id.*

King's argument concerning the calculation of the amount of the drugs is also unavailing. The district court carefully reviewed this argument in its sentencing memorandum and order. King claims that the drugs were initially weighed by

Espinoza to be 108.4 grams, while Washington later weighed the drugs to be 142.9 grams. As the district court noted in some detail, this argument has no merit. The issue was not only raised belatedly at sentencing, but also had little factual foundation. King's claim is not supported by the record. The record, including Espinoza's testimony, Criswell's DEA "Report of Investigation," and a Fort Wayne Police Department "Continuity Record" dated the same day as the arrest, make it clear that the drugs purchased by Espinoza weighed approximately 145.7 grams. There *is* a reference to a weight of 108 grams on the Continuity Record. The Continuity Record listed the weight of one bag of several rocks of methamphetamine as 108 grams. However, the Continuity Record also listed a second bag containing a single rock of methamphetamine and having a weight of 37.4 for a total of 145.8 grams of methamphetamine.

Finally, we do not believe Washington's testimony was vague. King argues that Washington testified that he took 25 grams of the methamphetamine and tested that amount. King argues that because Washington did not take a sample from each of the rocks of methamphetamine he received, the sample he did take cannot be considered representative.

King's recitation of Washington's testimony is incorrect. Washington testified that the contents of the evidence bag were weighed and then ground to a powder. Only after the contents were a powder (and thus uniform) did Washington remove 25 grams for analysis. These 25 grams were necessarily indistinguishable from, and thus representative of, the remainder of the powder. Washington's testimony was not vague. There was sufficient evidence for King's conviction.

*C.   Sentencing*

Finally King challenges his sentence. First, King argues that the district court improperly considered the weight of the drugs to be approximately 142 grams. The district court used this weight to arrive at a base sentencing level of 26. *See* U.S. Sentencing Guidelines Manual § 2D1.1(7). King argues that the weight of the drugs should be 25 grams because, as noted, the sample analyzed by Washington was not representative. His sentencing level, King argues, should, therefore, be 20. *Id.* at § 2D1.1(10). King also chal- lenges the district court's two-point enhancement for obstruction of justice. *Id.* at § 3C1.1. The district court suggested that it did "not recall ever hearing a bigger prevaricator." King argues that he should not have received the enhancement for testimony on his own behalf.

There is no need, however, to consider King's arguments because King is a career offender and does not challenge his career offender status. As a result of King's career offender status his offense level is 34. If the offense level mandated by the career offender guideline is greater than the offense level otherwise applicable under the guidelines (as it is here), the career offender offense level applies. U.S. Sentenc- ing Guidelines Manual § 4B1.1(b) ("[I]f the offense level for a career offender from the table in this subsection is greater than the offense level otherwise applicable, the offense level from the table in this subsection shall apply."). While his sentencing arguments have little merit, even if they had any substance, they would have no impact on King's sentence. His career offender status dictates the term of his sentence. *United States v. McNeil*, 90 F.3d 298, 300 (8th Cir. 1996). The sentencing range for an offense level of 34 and a criminal history category of VI is 262-327 months. King was sen- tenced to 262 months' imprisonment, the lowest sentence possible absent any downward departures.

### III.

For the foregoing reasons, the decisions of the district court are AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—1-28-04