# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-1857

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAMES D. STEWART,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 02-CR-50024—**Philip G. Reinhard**, *Judge.*

———————

ARGUED NOVEMBER 12, 2003—DECIDED MARCH 16, 2004

———————

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* James D. Stewart pleaded guilty, pursuant to a plea agreement, to one count of conspiring to manufacture, distribute, and possess with intent to manufacture and distribute methamphetamine in violation of 21 U.S.C. § 846 and § 841(a)(1). Stewart contends that the district court erred in finding him subject to a ten-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A)(viii) by including in the drug quantity for sentencing purposes 825 grams of a solution generated during a thwarted attempt to produce methamphetamine. Stewart argues that the solution could not be used to calculate drug weight under § 841(b) because it was not usable or consum-

able. Instead, Stewart argues, only the 2.4 grams of actual methamphetamine present in the 825-gram solution should have been counted, in which case he would not be subject to a ten-year mandatory minimum sentence. Because we conclude that the government's evidence does not support inclusion of the entire solution in the drug quantity, we vacate Stewart's sentence and remand for resentencing.

## I.  BACKGROUND

In March 2002, Stewart and a co-defendant were arrested while in Stewart's vehicle. In the back seat was a thermos containing the telltale ingredients of the pair's attempt to manufacture methamphetamine. At Stewart's sentencing hearing, DEA Special Agent Marc Folven gave conflicting testimony about the contents of the thermos when it was seized. On direct examination he said it contained crushed pseudoephedrine tablets, anhydrous ammonia, lithium strips from batteries, and ether. On cross-examination, however, Agent Folven omitted mention of the ether. The first two ingredients, when combined, together with a catalyst such as lithium, react to form a solution containing methamphetamine. After the reaction is complete, the undissolved solid materials are normally filtered out, and ether is then used as a solvent to separate the solution into two parts—a top layer constituting "methamphetamine base" and the rest liquid byproduct. Agent Folven conceded that Stewart would have needed to take additional steps to produce usable methamphetamine. First, to further process the contents of the thermos into methamphetamine base, Stewart had to filter out the remaining solid materials and separate the liquid byproducts leaving the base. From there, to further process the liquid methamphetamine base into the powdered form typically consumed by methamphet-amine users, Stewart had to add hydrochloric acid gas—often made from drain cleaner and salt—to crystallize

the methamphetamine base into powder. Following this final stage of processing, the liquid remaining after the methamphetamine base crystalized into powder would be considered waste, but would contain trace amounts of methamphetamine.

Although the record developed by the government is ambiguous, it appears that the investigating agents filtered the solid materials from the contents of the thermos, and weighed only the remaining solution in arriving at the 825-gram figure. A DEA chemist estimated, and both parties stipulated, that the entire 825 grams contained 2.4 grams of pure methamphetamine, which, after processing, Stewart could distribute in powder form. In addition to the contents of the thermos, Stewart and his co-defendant also had with them in the car when they were arrested several bags of fully processed powdered methamphetamine weighing 18 grams total and containing 3.1 grams of pure methamphetamine.

Stewart pleaded guilty to a count alleging that he conspired to manufacture, distribute, and possess with intent to manufacture and distribute 500 or more grams of methamphetamine, but reserved the right to challenge at sentencing the drug amount. For guidelines purposes the district court determined that Stewart's offense involved at least five grams but not more than 20 grams of actual, or pure, methamphetamine and thus calculated his imprisonment range to be 100 to 125 months. *See* U.S.S.G. § 2D1.1(a)(3), (c)(7). But for purposes of § 841(b) and its mandatory minimums, the district court concluded that the 825-gram solution from the thermos triggered a ten-year mandatory minimum under § 841(b)(1)(A)(viii) because it constituted "500 grams or more of a mixture or substance containing a detectable amount of methamphetamine." As a result, the district court adjusted the guideline range to 120 to 125 months, *see* U.S.S.G. § 5G1.1(c), and sentenced Stewart to 120 months.

In determining whether Stewart was subject to a mandatory minimum sentence under § 841(b), the district court purported to rely upon *United States v. Johnson*, 999 F.2d 1192, 1194-96 (7th Cir. 1993), in which we held that waste water left over from the production of crack cocaine, even though it held trace amounts of cocaine, could not be used in calculating drug weight under the sentencing guidelines because it "was not marketable and could not in any way be used as a drug." The district court reasoned that, unlike the waste water in *Johnson*, the entire 825-gram solution should be counted because it could be sold to someone who could either finish processing it into methamphetamine powder, or mix the solution with a soft drink and ingest it directly. The government concedes in its brief, however, that the solution was not ingestible in the form it was seized, and that in concluding otherwise the court apparently misconstrued Agent Folven's testimony. What Agent Folven said is that methamphetamine base can be mixed into a soft drink, but he did not testify that Stewart's solution was methamphetamine base. Indeed, the agent's testimony leaves little doubt that further processing of Stewart's solution would be required to separate the methamphetamine base. The solution could not have been safely ingested because it still contained anhydrous ammonia, a corrosive chemical that can be toxic if inhaled. *See United States v. Morrison*, 207 F.3d 962, 964 (7th Cir. 2000); *see also United States v. Innie*, 7 F.3d 840, 845 (9th Cir. 1993) (liquid contained methamphetamine "along with unreacted chemicals and by-products both of which are poisonous if ingested")*; United States v. Jennings*, 945 F.2d 129, 137 (6th Cir. 1991) (defendants were "attempting to distill methamphetamine from the otherwise uningestable [sic] byproducts of its manufacture").

The government, though, does not clarify whether Agent Folven was also referring to methamphetamine base, rather than to the solution possessed by Stewart, when he testified

about whether the solution could be sold to others. The transcript evidences that he meant that methamphetamine base could be sold:

Q. If you could explain. When is the methamphetamine actually produced in any form for the first time that it's produced during this process?

A. It's when the anhydrous ammonia, the lithium strips, and the pseudoephedrine are combined. It starts producing the methamphetamine. I mean, it's not powder form, it's a liquid type of form, but that's when that chemical reaction takes place to produce the methamphetamine.

Q. So, the methamphetamine at that point is in a liquid form?

A. Yes, sir.

Q. So, the methamphetamine, does it have any—in the liquid form, does it have any value, as far as marketability? Could it be sold and used at that point?

A. Yes, sir.

Q. And how is that?

A. There's been people that will buy the liquid meth, also, and people that use the liquid meth out there, also, methamphetamine base. They'll drink it or other various ways to use it that way.

Q. Can it be injected?

A. Probably not in that way. I think it's more or less drank that way.

Q. But you can—you say it does have a market in that stage.

A. Yes, sir.

Q.  And did I also hear your answer is that some people might use it in that stage?

A.  Yes, sir.

Q.  How?

A.  It's a very pure form of meth. I've interviewed other users, and they've said that they've drank it before.

Sentencing Tr. at 38-39. If Agent Folven was referring to methamphetamine base throughout this portion of his testimony, then there is no evidence that the solution possessed by Stewart had reached the stage in processing where it could have been sold to others for completion.

The district court also read three opinions from other circuits as holding that when a defendant is caught in the process of manufacturing drugs, the sentencing court can include in the drug weight anything found no matter its stage of completion. Two of the three cases, though, actually reach the opposite conclusion—that what is unusable; i.e., not consumable as a drug, must be excluded in calculating drug weight. *See United States v. Newsome*, 998 F.2d 1571, 1575-79 (11th Cir. 1993) ("the gross weight of 'unusable mixtures' should not be equated with the weight of a controlled substance for sentencing purposes"; applying sentencing guidelines); *United States v. Sprague*, 135 F.3d 1301, 1306 (9th Cir. 1998) (drug weight must exclude substances that must be removed to render solution containing methamphetamine usable; applying guidelines). Only one of the cases arguably supports the district court's drug quantity finding. *See United States v. Beltran-Felix*, 934 F.2d 1075, 1076 (9th Cir. 1991) (holding that entire weight of solution containing small amount of methamphetamine should be used to calculate mandatory minimum sentence under § 841(b) even though solution was in early stage of production).

## II. DISCUSSION

On appeal Stewart argues that sentencing courts, when applying the statutory penalties of § 841(b), should be constrained to exclude from the drug weight any unusable portion of a solution containing methamphetamine, just as they must do under the sentencing guidelines. The government counters that the plain language of § 841(b) requires inclusion of the full weight of any solution containing a detectable amount of methamphetamine, regardless of what else is in the solution.

### A. *Only usable or consumable mixtures or substances can be included in drug quantity under § 841(b)*

Under § 841(b), a person who commits a drug offense involving 500 grams or more of a "mixture or substance containing a detectable amount of methamphetamine" must be imprisoned for at least 10 years. The Supreme Court, in *Chapman v. United States*, 500 U.S. 453, 461 (1991), considered the meaning of "mixture or substance" under § 841(b). The Court defined the terms in accord with their plain, dictionary meanings[1] and held that "blotter paper customarily used to distribute LSD is a 'mixture or substance containing a detectable amount' of LSD." The Court explained that this result was consistent with the purpose of § 841, as expressed in the statute's legislative history.

---

[1] The Court used the following definitions: "A 'mixture' is defined to include 'a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence.' Webster's Third New International Dictionary 1449 (1986). A 'mixture' may also consist of two substances blended together so that the particles of one are diffused among the particles of another. 9 Oxford English Dictionary 921 (2d ed. 1989)." *Chapman*, 500 U.S. at 462.

The Court noted that Congress had "adopted a 'market-oriented' approach to punishing drug trafficking." *Id.* (citing H.R. Rep. No. 99-845, at 11-12, 17 (1986)). Under a market-oriented approach, "the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." *Id.* The Court reasoned that this sentencing scheme was rational because it "assigns more severe penalties to the distribution of larger quantities of drugs," including the "street weight" of diluted drugs. *Id.* at 465. The Court also noted that because carrier mediums (e.g., blotter paper for LSD) and cutting agents (i.e., substances added to decrease purity or increase amount of drugs for sale) aid in the distribution of drugs, their weight should be included for sentencing. *Id.* at 465-66. The Court explained that "Congress clearly intended the dilutant, cutting agent, or carrier medium to be included in the weight of those drugs for sentencing purposes. Inactive ingredients are combined with pure heroin or cocaine, and the mixture is then sold to consumers as a heavily diluted form of the drug." *Id.* at 460.

Prior to *Chapman*, in the context of reviewing drug quantity findings under the sentencing guidelines, this court and several others had held that any "mixture or substance" containing a detectable amount of drug should be counted in the drug weight, without regard to whether it was usable or consumable. *See*, *e.g.*, *United States v. Garcia*, 925 F.2d 170, 172-73 (7th Cir. 1991) (characterizing damp marijuana as a "mixture" of water and marijuana); *Beltran-Felix*, 934 F.2d at 1076-77 (holding that solution that had not yet been processed into usable methamphetamine was a "mixture" under § 841(b)); *United States v. Mueller*, 902 F.2d 336, 345 (5th Cir. 1990) (holding that solution that had not yet been processed into usable methamphetamine was a "mixture" under guidelines).

*Chapman*, though, sparked divergent views about calculating drug quantity, both under § 841(b) and the guide-

lines. The First and Tenth Circuits held after *Chapman* that the "plain language" of § 841(b) compels including in the drug weight for statutory purposes *any* part of a solid or liquid containing a detectable amount of drug. *See United States v. Richards*, 87 F.3d 1152, 1157 (10th Cir. 1996) (holding that solution not yet processed into usable meth-amphetamine was a "mixture"); *United States v. Mahecha-Onofre*, 936 F.2d 623, 625-26 (1st Cir. 1991) (holding that cocaine combined with acrylic material to form part of suitcase was a "mixture").

In contrast, after *Chapman* this court and six others have generally applied what has come to be known as the "market-oriented" approach when defining "mixture or substance." Under a "market-oriented" approach, only usa-ble or consumable mixtures or substances are included in the drug quantity for sentencing purposes. *See, e.g., United States v. Tucker*, 20 F.3d 242, 244 (7th Cir. 1994) (including weight of moisture in fully processed, consumable crack); *Johnson*, 999 F.2d at 1196-97 (excluding weight of unusable waste water in solution composed of waste water and traces of cocaine base); *United States v. Coleman*, 166 F.3d 428, 432 (2d Cir. 1999) (including weight of moisture in fully processed, consumable crack); *United States v. Acosta*, 963 F.2d 551, 553-54 (2d Cir. 1992) (excluding weight of creme liqueur from solution containing creme liqueur—used to conceal the drug—and cocaine); *United States v. Berroa-Medrano*, 303 F.3d 277, 284 (3d Cir. 2002) (including entire weight of heroin that was heavily diluted with common cutting agents)*; United States v. Rodriguez*, 975 F.2d 999, 1007 (3d Cir. 1992) (excluding weight of unusable and toxic boric acid from packages containing boric acid and a thin layer of cocaine); *United States v. Robins*, 967 F.2d 1387, 1389 (9th Cir. 1992) (excluding weight of cornmeal com-bined with cocaine); *United States v. Rolande-Gabriel*, 938 F.2d 1231, 1237-38 (11th Cir. 1991) (excluding weight of unusable liquid carrier medium where cocaine was dis-

solved in liquid). Although some circuits have applied a market-oriented approach only to § 2D1.1, we have made clear that the same analysis governs both the statutory penalties and those of the guidelines. *See Tucker*, 20 F.3d at 244; *Johnson*, 999 F.2d at 1196-97.

At the time *Chapman* was decided, the United States Sentencing Commission was explicit that the language of § 2D1.1, referring to "the entire weight of any mixture or substance containing a detectable amount of the controlled substance," had the same meaning as that in § 841(b). U.S.S.G. § 2D1.1, comment. (n.1) (superceded effective Nov. 1, 1993); *see also Neal v. United States*, 516 U.S. 284, 290 (1996). Responding to the inter-circuit conflict arising after *Chapman*, the Sentencing Commission in 1993 amended Application Note 1 to § 2D1.1 to make explicit that sentencing courts should exclude "materials that must be separated from the controlled substance before the controlled substance can be used." *See id.* App. C, Amdt. 484; § 2D1.1, comment. (n.1) (effective Nov. 1, 1993). Before this amendment, courts interpreting the language "any mixture or substance" in § 2D1.1 presumably believed that their analyses applied equally to both the guidelines and § 841(b). Indeed, although in *Johnson* we were specifically addressing a drug weight for calculation under the guidelines, our opinion rests squarely on our reading of § 841(b) and *Chapman*, not on any language unique to § 2D1.1. Thus, *Johnson*'s reasoning also answers the question posed in this case about § 841(b), and the government does not even contend that *Johnson* is limited to the guidelines.

In fact, in *Johnson* we explicitly interpreted *Chapman* to require a market-oriented approach in determining the meaning of "mixture or substance" under both § 841(b) and the pre-amendment version of § 2D1.1: "To read the statute or *Chapman* as requiring inclusion of the weight of *all* mixtures, whether or not they are usable, ingestible, or marketable, leads to absurd and irrational results con-

trary to congressional intent." *Johnson*, 999 F.3d at 1197 (emphasis in original). We recognized that persons who possess solutions at an early stage of the manufacturing process, or waste product in its aftermath, are not attempting to increase the amount of salable drug by adding a dilutant, cutting agent, or carrier medium, as was the concern in *Chapman*. *See id.* at 1196; *see also Richards*, 87 F.3d at 1159 (Seymour, J., dissenting). The partially processed solution may tell us how much of a drug *can be produced*, and the waste might tell us how much *was produced*, but neither material is usable in that form. Consequently, rather than weighing everything, it would seem reasonable to include only the amount of usable or consumable substances, *Johnson*, 999 F.2d at 1196, or the amount of drug that the defendant could have extracted from something that is unusable at the time of arrest, *Jennings*, 945 F.2d at 137.

As Stewart argues, weighing *everything* for sentencing purposes can lead to irrational results. We said as much in *Johnson*, posing the hypothetical of a farmer plowing remnants of his marijuana crop into the topsoil or a defendant dumping drugs into the toilet and the sentencing court considering the earth in the field or the water in the toilet bowl as part of a mixture that should be weighed along with the drugs. *Johnson*, 999 F.2d at 1196 n.8. We reasoned that such results would be contrary to legislative intent because Congress was concerned with mixtures that eventually will reach the streets. *Id.* (citing *Chapman*, 500 U.S. at 463). And while we thus agreed that "cutting agents and dilutants can be factored into the weight calculation," *id.* at 1197, we also concluded that substances which do not " 'facilitate the distribution,' " should not be counted because "there is no rational basis to a sentence based on the entire weight of a useless mixture," *id.* at 1196 (quoting *Chapman*, 500 U.S. at 466).

Although two circuits have declined to apply a market-oriented approach, nothing in those cases undermines our reasoning in *Johnson*. In fact, we made clear in *Johnson* that we disagreed with the First Circuit when that court included the entire weight of acrylic material combined with cocaine in *Maheche-Onofre* and gave no consideration to the fact that the material was not ingestible. *See Johnson*, 999 F.2d at 1196 n.9.

B. *No distinction for methamphetamine in market-oriented approach*

Four of the seven circuits, including this one, that have read *Chapman* to permit counting only usable or consumable substances as part of drug weight have not yet had occasion to apply this approach to methamphetamine. The Sixth Circuit, one of the three courts that after *Chapman* have undertaken to decide whether methamphetamine presents a special situation warranting a unique rule, held in a case interpreting the pre-amendment version of § 2D1.1 that a market-oriented approach should apply to methamphetamine just like any other drug. *See Jennings*, 945 F.2d at 137 (directing district court to include only the amount of methamphetamine that defendants might have produced from solution in preliminary stage of production). In contrast, the Fifth Circuit has held that a market-oriented approach should not apply to methamphetamine. *See United States v. Palacios-Molina*, 7 F.3d 49, 53 (5th Cir. 1993) (stating that *Chapman*'s market-oriented analysis applies to cocaine, but does not apply to methamphetamine or PCP). The Fifth Circuit, in *Palacios-Molina*, noted that in *Chapman* the Supreme Court had observed that methamphetamine and PCP are treated differently than other

drugs under the guidelines[2] and § 841(b),[3] in that sentencing could be based on either the weight of a mixture or the pure drug. *Palacios-Molina*, 7 F.3d at 53; *United States v. Sherrod*, 964 F.2d 1501, 1509-10 (5th Cir. 1992). The Fifth Circuit thus concluded that the Court had not intended to extend the market-oriented approach to methamphetamine. *Id.* The court also stated that, in contrast to the otherwise innocuous transport liquid with which the cocaine was

---

[2] "The terms 'PCP (actual)' and 'Methamphetamine (actual)' refer to the weight of the controlled substance, itself, contained in the mixture or substance. For example, a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual). In the case of a mixture or substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual), or methamphetamine (actual), whichever is greater." U.S.S.G. § 2D1.1, Drug Quantity Table (November 1992).

[3] For example, at the time *Palacios-Molina* was decided, § 841(b)(1)(a)(viii) provided for a mandatory minimum of 10 years for a violation involving "100 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 1 kilogram or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers," while the 10-year mandatory minimum for heroin, cocaine, and LSD was based only on a mixture or substance containing a detectable amount of the drug. Although Congress did not explain why it based the mandatory minimum sentences for methamphetamine and PCP on the amount of pure drug as well as a mixture, one commentator has suggested that the likely reason is that those drugs are more commonly sold in pure forms. *See* Todd E. Gonyer, comment, *Federal Sentencing in a Post*-Chapman *World: What is a 'Mixture or Substance' Anyhow?*, 46 U. Kan. L. Rev. 983, 991 n.69 (1998).

combined, precursor chemicals and waste materials involved in methamphetamine cases are not innocuous because they are necessary to manufacturing. *Palacios-Molina*, 7 F.3d at 53. The Ninth Circuit adopted similar reasoning when it stated that its pre-*Chapman* decision in *Beltran-Felix*, where the court endorsed including in drug quantity the entire weight of a solution containing both methamphetamine and unusable byproducts of the manufacturing process, is consistent with *Chapman*. *Robins*, 967 F.2d at 1390; *see Beltran-Felix*, 934 F.2d at 1076. According to the Ninth Circuit, the "solution facilitated the distribution of the methamphetamine" since the drug "could not have been produced without it," and thus the entire solution was properly counted for sentencing purposes. *Robins*, 967 F.2d at 1390. The Eighth Circuit, although it has not affirmatively adopted a market-oriented approach, used similar reasoning when it counted for statutory purposes a partially processed solution containing methamphetamine because the solution would eventually be processed into a distributable product. *See United States v. Kuenstler*, 325 F.3d 1015, 1023 (8th Cir. 2003).

Though the government makes no argument that our adoption of the market-oriented approach in *Johnson* covers some drugs but not methamphetamine, we observe for the sake of completeness that we reject the Fifth and Ninth Circuits' reasoning. The fact that Congress allows sentencing based on the pure amount of methamphetamine as an alternative to weighing a mixture containing the drug simply begs the question of what is meant by "mixture" in this context and in no way points to the conclusion that a special rule should be carved out for methamphetamine. Because Congress was concerned with distributable or usable drugs, it makes no sense that methamphetamine in an unusable and undistributable form be counted differently than cocaine in an unusable and undistributable form. Congress's concern as identified in *Chapman* was not

combinations of unrefined or unfinished drugs and sub-stances that will not be consumed and may even be toxic, but the amount of usable drug that will be available for distribution to consumers. Under the Fifth and Ninth Circuits' reasoning, the waste water remaining after the production of crack in *Johnson* would have to be counted as "drug" weight because the crack "could not have been produced without it," *see Robins*, 967 F.2d at 1390, but we instead held that this unusable byproduct does not count for sentencing, *see Johnson*, 999 F.2d at 1196.

### C. *Manufacturing versus distribution*

Essentially, the government expresses no real disagree-ment with what we have said so far, but instead argues that, even if it is improper to include the weight of the unusable portion of a solution when imposing a sentence for *distribution* offenses, Stewart's conviction is for *manu-facturing* and for this offense the full 825-gram solution still should be counted. The government points to the concurring opinion in *Johnson*, which cautions against reading our opinion as answering whether the waste water generated from producing crack could have been included for sentenc-ing had the defendant been charged with manufacturing cocaine, rather than possession with intent to distribute. *Johnson*, 999 F.2d at 1199. But the concurrence does not *advocate* a different rule for manufacturing offenses, and the government, other than saying that there ought to be a different rule for manufacturing cases, never explains why. Further, to our knowledge no court, even after the concur-rence in *Johnson*, has drawn any distinction between possession and manufacturing offenses.

The government's argument fails for two reasons. Most fundamentally, the government mischaracterizes the nature of Stewart's conviction. Stewart was convicted not of distribution or manufacturing, but of conspiracy to do *both*.

Although the government wants to call this a manufacturing case out of convenience, that is not how the government charged it. Moreover, § 841(a)(1) makes criminal the manufacture, possession, or distribution of controlled substances, and § 841(b) says uniformly to consider the weight of a "mixture or substance containing a detectable amount of drug." Nothing in the statute suggests that "mixture or substance" should be defined differently depending upon how § 841(a) is violated, and the government cites no authority, not even legislative history, for this proposition. At oral argument, the government simply offered its view that higher penalties should be reserved for manufacturing offenses because without the manufacture of drugs, there can be no distribution.

But what the government would prefer the rule to be as a policy matter is irrelevant, and we see no basis to read § 841(b) differently for distribution and manufacturing offenses. It is clear that if Stewart had completed processing the 825 grams of liquid into usable methamphetamine and discarded the waste before being caught, only the amount of finished product would be attributed to him for sentencing. *See, e.g.*, *United States v. King*, 356 F.3d 774, 779-80 (7th Cir. 2004) (sentence based on 145 grams of usable methamphetamine defendant sold to undercover detective). Similarly, if Stewart had been caught with his raw materials before starting to manufacture the methamphetamine, only the amount of finished product that could be produced from the raw materials would have been attributed to him for sentencing. *See United States v. Eschman*, 227 F.3d 886, 890-91 (7th Cir. 2000); U.S.S.G. § 2D1.1 comment. (n.12). It would be illogical to include the entire weight of the 825-gram solution in the drug quantity—thus subjecting Stewart to a mandatory minimum sentence—merely because Stewart was caught after he had combined the raw materials, but before he had produced usable methamphetamine; to do so would reward defen-

dants able to complete the manufacturing process without detection. *See Newsome*, 998 F.2d at 1578 ("We see no principled distinction for sentencing purposes between 'precursor chemicals' destined for conversion into a controlled substance and combinations of those chemicals that have been partially processed and are closer to the finished product at the time they are discovered.").

D.  *Marketable versus usable*

The government argues alternatively that, even under *Johnson*'s market-oriented approach, the district court should be affirmed because it found that the 825-gram solution was "marketable" to others who could finish the processing. As discussed above, the court may have misinterpreted the DEA agent's testimony that the solution possessed by Stewart could be sold to others. Moreover, we hold that it is immaterial under a market-oriented approach whether a solution can be sold to others for further processing if that solution is unusable and unconsumable.

The government offers no support for its argument that "marketable" as it uses the term is consistent with the "marketable" or "market-oriented" approaches as analyzed in the cases. All courts that have interpreted *Chapman* and applied a market-oriented approach have used "marketable" to mean "usable" or "consumable" or "ingestible" and have declined to include the weight of materials that must be separated from the drug before the drug can be consumed. *See Johnson*, 999 F.2d at 1196 ("Under a market-oriented approach, when the mixture is not ingestible and therefore not marketable there is no rational basis to a sentence based on the entire weight of a useless mixture."); *Tucker*, 20 F.3d at 244 (Because users "need not wait until the water evaporates before using the drug," the seized combination of water, cocaine and baking soda "comport[s] with the common understanding of 'mixture' recognized in

*Chapman*."); *Rodriguez*, 975 F.2d at 1007 (holding that a usable/unusable differentiation best follows the reasoning in *Chapman*). Further, at oral argument the government conceded that the 825-gram solution would likely have a lower value than the 2.4 grams of pure methamphetamine contained in the solution because of the labor yet to be expended in removing the unusable ingredients. It would be illogical to impose higher penalties for a solution that has less value than the pure drug contained in the solution merely because the solution arguably could be sold to someone at some price.

### III.  CONCLUSION

For the foregoing reasons, we reiterate our conclusion in *Johnson* that only usable or consumable mixtures or substances can be used in determining drug quantity under § 841(b). Under this approach, only the amount of pure drug contained in an unusable solution, or the amount of usable drug that is likely to be produced after that unusable solution is fully processed, may be included in the drug quantity under the statute. Although the district court purported to use a market-oriented approach, it did not exclude the unusable portion of the 825-gram solution from the drug quantity for purposes of § 841(b). Under a market-oriented approach, as described above, Stewart would not be subject to a ten-year mandatory minimum sentence, which requires 500 or more grams of a mixture or 50 or more grams of pure methamphetamine. Accordingly, we VACATE Stewart's sentence and REMAND with directions to the district court to sentence Stewart within his guideline range of 100-125 months.

No. 03-1857                                    19

A true Copy:

    Teste:

                   _____
                   *Clerk of the United States Court of*
                     *Appeals for the Seventh Circuit*

USCA-02-C-0072—3-16-04