# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-4075

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WILLIAM R. KAPP,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 CR 418—**Blanche M. Manning**, *Judge.*

———————

ARGUED FEBRUARY 22, 2005—DECIDED AUGUST 19, 2005

———————

Before KANNE, WOOD, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* A jury convicted William Kapp for multiple violations of the Endangered Species Act and the Lacey Act connected with the killing of, and trafficking in, endangered tigers and leopards and their meat, hides, and other parts. On appeal, Kapp claims he is entitled to a new trial because the evidence at trial was insufficient to support the jury's verdict and the district court erroneously admitted certain evidence. Kapp also argues that the manner in which he was sentenced violated the Sixth Amendment. We conclude, however, that there was sufficient evidence to support the jury's verdict on all counts,

and the district court did not err in its evidentiary ruling. We therefore affirm Kapp's conviction, but order a limited remand to determine whether Kapp should be resentenced in light of *United States v. Booker*, 125 S. Ct. 738 (2005).

## I.  Background

Many people enjoy or support hunting, and many do not. But surely most everyone could agree that the actions of William Kapp were detestable. From 1997 to 1999, Kapp and others purchased, killed, transported, and sold numerous exotic animals, including tigers and leopards, which are protected under the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq.* Kapp and the others did not hunt any of these animals in the wild. Instead, they shot the animals while they were helplessly confined, sometimes even posing afterwards for safari-style photographs with the carcasses. Kapp made thousands of dollars selling the meat, hides, and other parts of the animals, until the United States Fish & Wildlife Service ("USFWS") caught wind of these activities. The USFWS then executed "Operation Snowplow," an undercover sting operation leading to the arrest and conviction of Kapp and his co-conspirators. The following facts came to light at Kapp's trial.

### A.  *Kapp's Killing of, and Trafficking in, Endangered Animals*

Kapp was an Illinois corrections officer and taxidermist by trade. Kapp and his friend and fellow taxidermist Kevin Ramsey became involved in the purchase and sale of exotic animals in August 1997. Ramsey had heard that Steven Galecki, an exotic animal distributor, wanted to sell off some of his inventory of exotic cats. Ramsey relayed the information to Kapp, whose taxidermy clientele included wealthier potential buyers. Kapp contacted one of his taxi-

dermy clients, Dr. Robert Martinez, who expressed interest in purchasing some of the animals for the purpose of mounting and displaying them in his home.

Kapp and Ramsey met with Galecki at his business, Funky Monkey Exotics, in Crete, Illinois. Galecki was properly licensed with the USDA to keep and exhibit exotic animals. But because of "difficulties" with the USDA, Galecki could no longer afford to keep the animals. Galecki was offering for sale two African lions, several mountain lions, and two black spotted leopards. Kapp expressed interest in the animals but was concerned because the leopards were listed as endangered and Kapp did not have the appropriate license to possess such animals. Galecki assured Kapp that donations of endangered species were not prohibited, so the federally required transfer paperwork could be marked "donation" to make the transaction appear legal.

On August 7, 1997, Kapp, Ramsey, and Martinez went to the Funky Monkey to see and purchase the cats. Galecki informed Martinez of the plan to fudge the USDA forms to make the transaction appear legal. Thus assured, Martinez used Ramsey's handgun to shoot both lions, one mountain lion, and one of the leopards, while the animals were confined in their pens. Kapp and the others dragged the carcasses into a field and posed for staged photographs. Martinez paid about $5500 for the hides of the animals he shot, and Galecki filled out a USDA Form 7020 to reflect that the animals had been "donated" to Martinez. Galecki also told Kapp and the others that he could acquire other animals, including tigers, for the men.

Kapp, Ramsey, and Galecki took the carcasses to Czimer's Game and Seafoods, Inc., owned by Richard Czimer, an exotic meats dealer. There, they skinned and weighed the carcasses. Galecki sold all but the leopard meat to Czimer, although the evidence indicated that Czimer offered to pur-

chase the leopard meat, too. Czimer paid $2392.50 for the meat (about $3.00 per pound). Czimer recorded the transaction as a purchase of "lions." Kapp tanned, mounted, and delivered the leopard hide to Martinez.

True to his word, Galecki later found two Bengal tigers for Kapp and Martinez. Martinez agreed to purchase one of the tigers and advanced $2000 for that purpose. Kapp convinced another client, David Woldman, to purchase the second tiger for $2500 up front, and an additional $2000 after delivery of the mounted animal.

Kapp, Martinez, and Woldman traveled to the Funky Monkey to purchase the tigers. As before, the animals were shot while confined, and Galecki falsified USDA transfer documents to reflect that live animals had been donated to Marinez and Woldman. The men posed for photographs with the animal carcasses. Kapp and Galecki brought the carcasses to Czimer's, where they were skinned, weighed, and sold. Kapp mounted a tiger hide and later delivered it to Woldman, per their arrangement.

By early 1998, Galecki departed the exotic animal business, so Kapp was forced to look elsewhere for a source. He found one in Todd "Squirrel" Lantz, a wildlife dealer in Missouri. Lantz offered to sell Kapp one Siberian and three Bengal tigers at the price of $1000 apiece. Kapp arranged to sell two of the tiger hides to George Riley, a Michigan businessman. Kapp also offered Riley hides from a black spotted leopard and two lions. Riley expressed concerns about the legality of the sale, but Kapp assured him that the hides could be "donated." Riley then gave Kapp an advance of $10,500 for all of the hides.

In February, Kapp and Ramsey brought a trailer to Lantz's ranch in Missouri. There, Kapp shot and killed the tigers while they were confined in the trailer. He paid Lantz for the tigers with part of the money fronted by Riley. Kapp and Ramsey skinned and cleaned the tigers while en route

back to Illinois. As before, the men sold the meat to Czimer's. In May 1998, per the arrangement, Kapp delivered to Riley hides from the two tigers, a leopard, and two lions.

In March 1998, Lantz delivered Kapp nine tigers and two lions. Kapp and Ramsey selected the eight largest tigers, but rejected the two lions and the remaining small tiger. At Kapp's suggestion, they slaughtered the eight tigers in an Alsip, Illinois, warehouse owned by Ramsey's family. Again, Kapp sold the meat to Czimer's. As to the hides, however, Kapp's luck finally took a turn for the worse. Robert Hetzel, one of Kapp's prospective buyers, contacted the USFWS to check the legality of the tiger hide purchase, likely alerting the agency to Kapp's activities. The agency responded that the transaction would not be legal, so Hetzel and several other prospective buyers backed out.

In the meantime, Lantz asked Sherry Roche, an animal dealer in southern Illinois, if she would house the two lions and the small tiger that Kapp had rejected. Unbeknownst to Lantz, Roche was cooperating with agents of the USFWS, which had been investigating Galecki but were now watching Kapp, too. At the USFWS agents' request, Roche agreed to care for Lantz's animals. Roche also agreed to inform Kapp that buyers were interested in the animals.

On April 1, 1998, Kapp and Ramsey traveled to Roche's farm, where the two men killed the lions and the small tiger while the animals were confined in a trailer. USFWS agents secretly videotaped the killings and later collected remaining blood and tissue samples. Kapp and Ramsey sold the meat to Czimer's and stored the hides at Kapp's home. Kapp gave Roche $3500, to be forwarded to Lantz.

Later that April, Kapp offered to sell a New Jersey interior decorator the skull and hide of one of the Bengal tigers killed in March. Kapp assured the prospective buyer (who actually was an undercover USFWS agent) that there were

"all sorts of little tricks" to work around laws restricting the sale. The agent agreed to purchase the hide and skull. Kapp dutifully sent the items and also asked Roche to prepare a falsified Form 7020 indicating the donation of the tiger skull and hide.

In May 1998, agents secretly recorded Kapp asking Roche to prepare more false forms to cover Kapp's prior sales of tiger and leopard hides. At the direction of the agents, Roche agreed. Kapp provided Roche with facts to be included on the forms, including the species, cause of death, and the names and addresses of the "donees."

In June 1998, Kapp purchased a group of cats from Stoney Elam, an Oklahoma animal dealer. By this time, the agents were determined to stop the killing of any more animals. At the agents' request, Roche suggested to Kapp that it would be more profitable to buy live animals and breed them themselves. Kapp agreed. Roche picked up the animals from Elam and returned them to her farm.

In early July, Riley expressed interest in purchasing a black leopard hide. Kapp informed Roche of his intent to kill one of the leopards they had purchased from Elam. At the direction of the agents, Roche told Kapp that she already had a black leopard carcass in frozen storage that Kapp could sell to his client instead of killing one of the live animals. Kapp agreed, and on July 9, 1998, he picked up the leopard carcass. Kapp also falsified forms indicating the donation of one leopard to Riley. In August, at Riley's request, Kapp sent the leopard carcass to a taxidermist in Michigan.

In October 1998, Kapp obtained from Lantz and Elam two cougars, one tiger, and one "liger."[1] Kapp later sold the tiger

---

[1] As its name suggests, a "liger" is a cross between a male lion and a female tiger. Ligers do not occur naturally, so all known

(continued...)

hide to one of Riley's associates, who had the hide mounted. Other evidence indicated that Kapp sold meat from the cougars, and possibly the liger, to Czimer's. A month later, Kapp was secretly recorded asking Roche to falsify a transfer form reflecting donation of a tiger carcass to Riley's associate.

In the spring of 1999, one of the leopards kept at Roche's farm died of natural causes. Kapp offered to sell the leopard's hide to David Woldman, who agreed to the purchase. Kapp sent the leopard hide and two tiger hides to a New York tannery. This transaction would mark the end of Kapp's trade in protected animals and their parts.

In May 1999, USFWS agents raided and searched Kapp's home. Agents also raided the homes of Kapp's associates. Kapp quickly attempted to reduce his exposure to prosecution. For example, Kapp instructed Ramsey to withhold information from the authorities. Kapp also tipped off Woldman before the arrival of the USFWS agents. Woldman destroyed incriminating photographs and the mounted tiger in his possession and falsely told the agents that he had not received a mounted tiger from Kapp.

Kapp's damage control efforts came to naught—Operation Snowplow was a success, leading to the arrests of Kapp and some fifteen others in four different states. The government

---

[1] (...continued)

ligers are in captivity. They apparently are a source of fascination in popular culture. *E.g.*, NAPOLEON DYNAMITE (Paramount Pictures, 2004) ("It's pretty much my favorite animal. It's like a lion and a tiger mixed . . . bred for its skills in magic."). As interspecies hybrids, ligers are not protected under U.S. wildlife laws. Nor are the various other tiger/lion hybridizations, such as the "ti-tigon" (offspring of a female tigon and male tiger) or the "ti-liger" (offspring of a female liger and a male tiger). (Tr. 692-99.) As discussed in greater detail below, hybrids—particularly ligers—figure prominently in Kapp's arguments on appeal.

confiscated numerous animal trophies, records, and other evidence of illegal trafficking in endangered animals and their parts.

### B. Kapp's Trial

On January 23, 2001, Kapp and six co-defendants[2] were charged in a 19-count indictment with conspiracy to violate the Endangered Species Act ("ESA") and the Lacey Act in violation of 18 U.S.C. § 371 (count 1), with multiple violations of the ESA, 16 U.S.C. §§ 1538 and 1540, and with multiple violations of the Lacey Act, 16 U.S.C. § 3371. Specifically, Kapp was charged with having violated the ESA by knowingly and without permission (1) killing endangered tigers and leopards within the United States (counts 2, 7, 17, and 25), (2) transporting endangered tigers in interstate commerce during the course of a commercial activity (count 23), and (3) selling and offering to sell an endangered leopard in interstate commerce (count 24). Kapp was accused of violating the Lacey Act by (1) knowingly selling tigers and leopards and their parts having a value exceeding $350, knowing that the animals and parts were sold in violation of the ESA and related regulations (counts 3, 5, 8, 11, 13, 14, 16, 18, 20, 21, and 26), and (2) knowingly making and causing to be made false records related to endangered tigers and leopards and their parts, knowing that said animals and animal parts had been, or were intended to be, transported in interstate commerce (count 22).

Kapp moved to dismiss the indictment on the ground that it failed to allege that the animals at issue were not "hybrid crosses," that the animals were captive, and that §§ 1538(a)(1) and 1540(b)(1) of the ESA were void for vague-

---

[2] Kapp's co-defendants pleaded guilty pursuant to various plea agreements.

ness for failing to clarify "at what point an animal loses its endangered status." The district court denied the motion, and the case proceeded to an eight-day trial before a jury. The government presented a sizable body of witness testimony, including testimony from Kapp's co-conspirators who had pleaded guilty, USFWS agents and other witnesses, and experts testifying as to the identity of the animals in question. The government also presented substantial physical evidence—including documents, taped conversations, photographs, hides, skulls, and even fully mounted tigers and leopards—in support of its case against Kapp.

On April 3, 2003, the jury returned a verdict of guilty on all counts but two (counts 5 and 25). On November 14, 2003, the court sentenced Kapp to a term of imprisonment of 51 months, to be followed by a three-year term of supervised release. The court also ordered Kapp to pay a fine of $5000 and to perform 300 hours of community service.

## II. Discussion

On appeal, Kapp challenges the sufficiency of the evidence supporting his conviction. He also takes issue with the district court's admission into evidence of mounted tigers and leopards, claiming that it was unduly prejudicial and improperly aroused the emotions of the jury. *See* Fed. R. Evid. 403. Finally, Kapp seeks resentencing because, he contends, the manner in which he was sentenced was contrary to the Supreme Court's holding in *United States v. Booker*, 125 S. Ct. 738 (2005). We take these arguments in turn.

### A. Sufficiency of the Evidence—Endangered Species Act Violations

In challenging the sufficiency of the evidence, Kapp faces an uphill climb. We must evaluate whether, "after viewing the evidence in the light most favorable to the prosecution,

*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Hicks*, 368 F.3d 801, 804-05 (2004) (quotations omitted). This standard applies to all the evidence, both direct and circumstantial, together with all reasonable inferences to be drawn therefrom. *United States v. Jordan*, 223 F.3d 676, 683 (7th Cir. 2000) (citation and quotation omitted). We defer to the credibility determinations of the jury, "and we overturn a verdict only when 'the record contains no evidence, regardless of how it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt.'" *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005) (quoting *United States v. Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002)). In short, we must determine "whether the fact finder's take on the evidence was wholly irrational . . . ." *United States v. Hoogenboom*, 209 F.3d 665, 669 (7th Cir. 2000).

Before turning to Kapp's arguments on the merits, we will briefly review the reach of the ESA, the principal statute under which Kapp was convicted. The ESA, 16 U.S.C. §§ 1531, *et seq.*, prohibits a wide range of conduct with respect to various species of fish and wildlife that are protected—that is, specifically listed as endangered or threatened. Under the ESA, "fish and wildlife" is defined as "any member of the animal kingdom, including without limitation any mammal . . . [and] any part, product, egg, or offspring thereof, or the dead body or parts thereof." 16 U.S.C. § 1532(8); *see also* 50 C.F.R. § 10.12. The Department of the Interior has delegated to the USFWS the authority to enforce the ESA.

Protected animals are listed by their common and scientific names pursuant to the Linnean system of classification: first by genus (capitalized), then by species (not capitalized) and, if applicable, by subspecies (also not capitalized). 50 C.F.R. § 17.11. Animals may be listed as protected at the

species level, the subspecies level, or by specific population or geographic range. *Id.* The regulations specify that

> [t]he listing of a particular taxon includes all lower taxonomic units. For example, the genus Hylobates (gibbons) is listed as Endangered throughout its entire range . . . ; consequently, all species, subspecies, and populations of that genus are considered as Endangered for purposes of the Act.

50 C.F.R. § 17.11(g). Clearly, then, when an animal is listed as protected at the species level, all subspecies of that animal are also protected. *Cf. id.* If, however, an animal is listed only at the subspecies level, animals of the same species but different subspecies are not protected unless those subspecies are separately listed. *Cf. id.*

Neither the ESA nor the regulations, however, refer specifically to hybrids, which are crosses between listed and unlisted animals. Although the Department of the Interior at one time sought to protect hybrids under the ESA if at least one parent was a member of an endangered species, the Department reversed this position because of the adverse impact the protection of such hybrids would have on efforts to preserve listed species. At all times relevant to Kapp's case, the USFWS enforced a policy, consistent with 50 C.F.R. § 17.11(g), in which hybrids of a listed species and an unlisted species are not protected under the ESA. (*See, e.g.*, R. 150, Exs. B, C, D, E, F (Legal Memoranda from the Office of the Solicitor, Dep't of the Interior, to USFWS).) Similarly, the USFWS policy did not allow for protection of hybrids of animals *listed at the subspecies level* and unlisted subspecies. (*See id.*)

Kapp was convicted for his actions involving tigers and leopards. Tigers (*Panthera tigris*) and leopards (*Panthera pardus*) are listed at the species level as endangered pursuant to 16 U.S.C. §§ 1532 and 1533. Because these animals are protected at the species level, all tiger and leopard sub-

species are similarly protected, as set forth in the regulations. 50 C.F.R. § 17.11(h). Pursuant to the regulations and USFWS policy, therefore, all members of all subspecies of tiger and leopard, including the offspring of different subspecies of tigers and different subspecies of leopards, are protected under the ESA. But crosses between tigers or leopards (including all subspecies) and members of unlisted *species* or subspecies, such as lions, are not protected. Therefore, ligers or tigons, which are hybrids of tigers (*Panthera tigris*, listed) and lions (*Panthera leo*, not listed), are not protected.

Kapp does not dispute that he purchased and killed a large number of exotic cats and that he harvested and traded their parts in interstate commerce. Rather, Kapp claims that this case "is about genetics." Kapp contends that the government failed to prove beyond a reasonable doubt that the animals at issue were endangered and protected under the ESA, because it was theoretically possible that the animals were actually unprotected hybrids at the species level. Kapp takes the position that the government should have proved, presumably through DNA or other genetic evidence, that the animals were *not* ligers, tigons, or other non-protected species hybrids. Similarly, Kapp argues that the evidence was insufficient to show that the slain animals were not unprotected hybrids at the subspecies level (for example, hybrids of two different subspecies of tiger or leopard).

Kapp's arguments are flawed in so many respects, it is difficult to know where to begin. We can, however, safely dispense with Kapp's suggestion that the leopards at issue in his case may have been unprotected hybrids at either the species or subspecies level. Kapp failed to present evidence in support of this line of argument at trial, nor did he develop this theory in his appellate briefs, so he has waived it. *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003). We view Kapp's appeal, then, as challenging the

sufficiency of the evidence only with respect to tigers (although we may occasionally mention leopards in our discussion of the evidence presented at trial).

With that, we can turn to Kapp's species-level-hybrid argument. As noted, Kapp contends that the government failed to prove beyond a reasonable doubt that the tigers at issue were not unprotected tiger hybrids, such as ligers. In support, Kapp hones in on the testimony of one of the government's expert witnesses, Bonnie Yates, head of the morphology section and mammal unit coordinator of the USFWS Forensic Laboratory. Kapp points to the fact that Yates admitted that she had little experience with identification of hybrids at the species level. On this slender reed Kapp rests his assertion that the government "offered no credible evidence that the[ ] animals were endangered at the species level."

We can find no indication that Kapp challenged Yates's qualifications as an expert witness or the district court's instructions to the jury regarding Yates's expert testimony, and he certainly raises no such arguments here. Yates testified to her extensive academic training and experience as a forensic morphologist,[3] in which she was and is responsible for identifying parts and products derived from mammals, such as bones, claws, or hair. In her experience, Yates has made identifications of approximately 100,000 specimens.

The government introduced a substantial number of hides, mounts, and other animal parts that had been con-

---

[3] As Yates testified, morphologists identify specimens by direct visual comparisons to known and catalogued specimens ("voucher specimens") in museums or other scientific collections. Morphologists also make systematic use of detailed recorded descriptions of animals contained in various learned treatises, scientific papers, and field guides.

fiscated from Kapp and his co-defendants. The record indicates that Yates gave detailed testimony with regard to these animal specimens. On the basis of her experience and qualifications, Yates examined the specimens and identified all but one to a reasonable degree of scientific certainty as having come from endangered tigers or leopards. During her testimony, as she identified each specimen, she explained the basis for her conclusion and called attention to the most prominent physical characteristics from which she derived her conclusions.

Yates identified one hide recovered from Kapp's home as a liger hide. She admitted that she had little experience with tiger hybrids, because there was little scientific information available. Her research in that area was largely confined to one scientific publication and internet sources. Yates did testify, however, that ligers have a number of identifying characteristics making them visually distinct from tigers. Several photographs of ligers illustrating these distinguishing characteristics were entered into evidence and presented to the jury. In addition, during cross-examination, Yates rejected the possibility that the tigers she had identified might be hybrids.

Upon review of the record, we cannot agree with Kapp's contention that there was insufficient evidence that the animals at issue were tigers as opposed to unprotected species-level hybrids. There is no suggestion that Yates was not qualified to offer the testimony that she did, and the record discloses that Yates's testimony was detailed, comprehensive, and supported by other evidence presented to the jury. The jury certainly could reasonably conclude, based on Yates's testimony, that the animals were in fact endangered tigers and leopards.

In any event, Yates's testimony was not the only evidence presented to the jury. The jury also heard the testimony of Steve Fain, supervisor of the genetics section of the USFWS Forensic Laboratory. Fain performed DNA analysis on one

of the hides and tissue and on blood samples taken from Roche's farm. Fain identified the samples as coming from tigers, although he conceded that current DNA identification methods could not definitively rule out the possibility that there could be some lion genes in the animals' paternal history. But Fain also testified that the more definitive method of ruling out interspecies hybridization is morphological analysis, thus reinforcing the reliability of Yates's testimony and conclusions.

Perhaps the most damning evidence before the jury, however, came from Kapp himself. The government presented substantial evidence that Kapp was well aware of the distinction between the protected animals and unprotected hybrids like ligers. For example, evidence showed that Kapp had purchased ligers, had a tanned liger hide in his home, specifically described ligers in a recorded conversation with an undercover agent, and identified certain hides as "liger" on transmittal records.

These acts contrasted sharply with Kapp's actions regarding the endangered tigers and leopards at issue in this case. In tape-recorded conversations, Kapp always referred to the animals he planned to purchase, kill, transport, and sell as tigers or leopards, not ligers or other hybrids. He also made clear his understanding that tigers were protected by the ESA, whereas ligers were not. Moreover, the jury saw evidence of Kapp's efforts to conceal his conduct. The falsified USDA forms prepared by or at the direction of Kapp reflected that the animals were tigers or leopards, not hybrids thereof. Plus the documents falsely reflected "donation" of the animals, indicating Kapp's understanding of the law and his solution to get around it. Finally, the government presented evidence of Kapp's efforts to hide evidence of his transactions once it became clear that the government was investigating him.

All of this evidence together and in context supports the

jury's conclusion that the animals at issue were endangered and not interspecies hybrids. In sum, the jury could reasonably infer not only that the animals in question were tigers, but also that Kapp understood the difference between tigers and ligers and that he knew his actions were illegal. We conclude that the evidence presented at trial was amply sufficient to support Kapp's conviction on the ESA counts.

Kapp's subspecies hybrid argument fares no better. Again, Kapp finds fault with the testimony of Yates. Yates admitted that she was unable to identify particular subspecies of tigers at issue, nor could she conclude to a reasonable degree of certainty whether any of the tigers actually were hybrids of various subspecies of tiger (inter-subspecific crosses). This means that Yates could not identify, for example, whether a particular tiger was a Sumatran or Bengal tiger or a hybrid of the two. Fain, the government's other expert, also acknowledged that he could not determine whether the tigers were subspecies hybrids.

These apparent shortcomings are irrelevant, however. Kapp's argument rests upon the faulty premise that the ESA does not protect *any* inter-subspecific crosses—that if two subspecies of tiger, such as a Bengal tiger (*Panthera tigris tigris*) and a Siberian tiger (*Panthera tigris altaica*), produce offspring, it would be an unrecognized taxonomic unit and therefore an unprotected hybrid. But as already noted, the regulations make clear that "[t]he listing of a particular taxon includes all lower taxonomic units." 50 C.F.R. § 17.11(g). The relevant taxon in this case is *Panthera tigris*, which is the tiger at the species level. All subspecies of tiger are therefore protected, so it does not matter whether Yates could identify a particular hide as coming from a Bengal tiger or some other subspecies.

Kapp selectively cites various Department of Interior and USFWS writings to support his contention that hybrids of two protected subspecies (e.g., protected tiger subspecies) are not protected under the ESA. With these writings, Kapp

suggests that the government's hybrid policy does not protect inter-subspecific hybrids (even if the species is listed) or that the policy is hopelessly inconsistent.[4] Neither conclusion is correct, nor relevant, for that matter. As discussed at length above, the implementing regulations make clear that subspecies of tiger (and therefore, inter-subspecific crosses of tiger) are endangered and protected because tigers are listed at the species level. 50 C.F.R. § 17.11(g). Even if a USFWS pamphlet was less than clear, or even contradictory, such publications do not trump the controlling law and regulations at issue in Kapp's case.[5] Moreover, the cited documents addressing unprotected subspecies hybrids are inapposite because they relate to animals that are listed at the subspecies, not the species, level—a circumstance not present here. *E.g.*, 50 C.F.R. § 17.11(h). Kapp's position that inter-subspecific crosses of tigers are not protected by the ESA finds no support in the law or relevant implementing regulations. We therefore reject Kapp's subspecies hybrid argument in its entirety.

---

[4]  Bizarrely, Kapp contends in his reply brief that "if there is any consistent USFWS 'hybrid policy' it is that the purpose of conservation under the ESA is to protect purebreds or 'pure genetic heritage.' Perhaps because its purpose reeks of the antebellum South or Nazi Germany this genetic snobbery is downplayed." Needless to say, the latter comment is completely unsupported and does not advance Kapp's subspecies hybrid argument in any positive sense.

[5]  We note that the district court disallowed evidence at trial that Kapp had relied on allegedly incorrect information contained in various USFWS publications concerning the protected status of subspecies hybrids (and with good reason, as a number of these publications post-date the acts for which Kapp stood trial). In any event, Kapp wisely does not appeal this aspect of the district court's evidentiary rulings.

### B. Sufficiency of the Evidence—Lacey Act Violations

The Lacey Act, 16 U.S.C. §§ 3371, *et seq.*, prohibits a range of activity involving wildlife that has been taken, possessed, transported, or sold in violation of an underlying federal, state, or foreign law or regulation (the ESA, for example). The Lacey Act also prohibits falsification of records, accounts, or labels for fish and wildlife with knowledge that the fish or wildlife has been, or is intended to be, transported in interstate commerce. 16 U.S.C. § 3373.

Kapp's argument is simple: he could not have been convicted for Lacey Act violations because he did nothing in violation of the ESA. Kapp is wrong about the evidence supporting his conviction for violations of the ESA, for the reasons extensively set forth above. All of the evidence that sufficiently supported Kapp's conviction under the ESA likewise supports his conviction for violations of the Lacey Act. In addition, the government offered ample evidence, as recounted in the facts, to fulfill the unique requirements of the Lacey Act. On the basis of the evidence presented, we conclude that the jury could reasonably find Kapp guilty beyond a reasonable doubt on the Lacey Act counts.

### C. Challenge of the District Court's Evidentiary Ruling

We turn now to Kapp's challenge to the admission of mounted tigers and leopards into evidence. At trial, Kapp objected to the admission of the mounts, claiming that the probative value of the evidence was substantially outweighed by undue prejudice. The district court rejected Kapp's challenge, finding that the mounts were "the best available physical evidence" and that their admission would "allow[ ] the government to demonstrate, and the jury to observe . . . that the animals in question were, indeed, endangered leopards and tigers protected by the ESA." The mounts were highly probative, the court reasoned, because they "allowed the jury to see that the animals had been

killed, how they were processed after killing, and Kapp's motive in participating in their killing and processing."

Kapp argues on appeal that the court's ruling was "particularly egregious" because jurors were "left with an indelible impression of beautiful animals having been killed and mounted" and may have "punished" Kapp for killing animals, irrespective of whether those animals were endangered.

The district court has broad discretion to determine admissibility of evidence, and we will reverse only upon a clear showing that the court abused its discretion. *See United States v. Pulido*, 69 F.3d 192, 201 (7th Cir. 1995). Federal Rule of Evidence 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Evidence is not to be excluded simply because it might be graphic or disturbing, *see United States v. Lightfoot*, 224 F.3d 586, 588 (7th Cir. 2000), and if evidence is probative of an issue relevant to an element of the offense, it must be admitted in all but the most extreme cases. *See id.* at 588 ("revolting" evidence admissible despite risk of prejudice); *accord United States v. Lopez*, 271 F.3d 472, 482 (3d Cir. 2001) (photographs depicting serious disfigurement by mutilation admissible); *United States v. Allen*, 247 F.3d 741, 793 (8th Cir. 2001), *judgment vacated on other grounds*, 536 U.S. 953 (2002) (autopsy photographs admissible).

In this case, we find persuasive the district court's assessment that the tiger and leopard mounts were not only relevant, but highly probative and assisted the jury in understanding and evaluating the testimony of the witnesses, particularly Yates. As Kapp is fully aware, the prosecution of his case required the government to identify the animals in question and show that they were in fact endangered, and key to that determination was the testimony of Yates

and other witnesses. The record makes clear that the animal mounts admirably served the purpose of assisting the jury's understanding of that testimony, as the jury was able to conduct its own visual examination of the evidence and evaluate the conclusions of Yates and other witnesses. *Cf. United States v. Salameh*, 152 F.3d 88, 122-23 (2d Cir. 1998) (noting that evidence that assists the jury to understand a witness's testimony, even if disturbing, is generally admissible). What is more, Kapp has failed to show that the mounts were somehow offensive, nor is there any indication that the mounts induced the jury to decide Kapp's case on the basis of emotion rather than on the evidence presented. *See Pulido*, 69 F.3d at 201; *accord United States v. Carpenter*, 933 F.2d 748, 751 (9th Cir. 1991) ("gruesome" videotape depicting dead, charred, and decomposing birds was admissible and not unduly prejudicial in a Lacey Act case).

In sum, we agree with the district court's conclusion that "[t]he mounts were no more shocking or disturbing than the mounted animals displayed at any museum of natural history. . . ." Even if the mounts had some potential to arouse emotional antipathy against Kapp, this must be balanced against the probative nature of that evidence. We cannot say that the probative value of the animal mounts was substantially outweighed by any risk of unfair prejudice or that the district court abused its discretion in allowing the mounts to be presented to the jury. *Cf. Lightfoot*, 224 F.3d at 588 (Rule 403 balancing "is the quintessential job for the trial judge, who is in a far better position to weigh the advantages and disadvantages of admitting particular evidence."). Kapp, therefore, is not entitled to a new trial on that or any other basis.

*D. Sentencing Issues*

Finally, we turn to Kapp's contention that he was sentenced in violation of the Sixth Amendment because the district court imposed a sentence pursuant to the sentencing guidelines and on the basis of facts not found by the jury beyond a reasonable doubt. This argument, of course, implicates *United States v. Booker*, 125 S. Ct. 738 (2005), in which the Supreme Court extended the principles articulated in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to the federal sentencing guidelines and rendered the guidelines advisory.

The record discloses that the court found that Kapp had a base offense level of 6. The court, however, enhanced Kapp's sentence by 16 levels on the basis of facts found by a preponderance of the evidence—Kapp was a leader or organizer, Kapp was motivated by a desire for pecuniary gain, the value of the wildlife at issue was between $200,000 and $350,000, and Kapp obstructed justice. These enhancements brought Kapp's offense level to 22, increasing his potential maximum penalty from 6 to 51 months' imprisonment. The court then imposed the maximum allowable sentence of 51 months' imprisonment, in addition to fines, supervised release, and community service.

Kapp's sentencing took place before the Court issued its decision in *Booker*. Kapp brought no challenge to the manner of his sentencing before the district court, so we review for plain error only. Pursuant to this court's opinion in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), we therefore order a limited remand of this case so that the district court may advise us whether it would have imposed the same sentence knowing that the guidelines are not mandatory.

### III.  Conclusion

For the reasons given, we AFFIRM Kapp's conviction. While retaining jurisdiction over the case, we REMAND this case for the limited purpose of allowing the district court to advise us of its intentions regarding Kapp's original sentence.

A true Copy:

   Teste:


       _____
       *Clerk of the United States Court of*
       *Appeals for the Seventh Circuit*