In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1602

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES R. WINBUSH, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:05 CR 76—**Philip P. Simon**, *Judge.*

ARGUED APRIL 14, 2009—DECIDED SEPTEMBER 1, 2009

Before KANNE, ROVNER, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* James Winbush is a drug dealer, and he was caught red-handed plying his trade. Police watched as Winbush sold crack cocaine to a confidential informant, after which Winbush brandished a handgun and fled his vehicle. A jury convicted Winbush of five federal crimes, and he now challenges both his conviction and his sentence. Despite the commendable and zealous advocacy of his appointed appellate counsel, we find no merit to Winbush's challenges.

## I. BACKGROUND

On December 20, 2004, the Gary Police Department staged a controlled purchase of over five grams of crack cocaine from James Winbush. Police followed Kenneth Jones, a police informant, as he parked his vehicle on the 2300 block of Kentucky Street in Gary. Winbush arrived in another vehicle moments later, and police observed what appeared to be a narcotics transaction. Their suspicions were confirmed when Jones returned to the police station with 5.8 grams of cocaine base.

Police tailed Winbush and a passenger after they left the scene and pulled them over approximately two blocks from where the drug deal had occurred. As officers approached the vehicle, they saw a gun in Winbush's right hand, pointed upward. Winbush shoved his passenger, Timothy Frazier, out the side door, then fled through the same door. Frazier stayed on the ground, as the police had commanded, and was taken into custody. Police found 288 grams of marijuana in a bag on Frazier's chest. Frazier later testified that Winbush told him, "I might need you to run with this," and left the bag as he fled.

Police chased Winbush and caught him on the 2300 block of Kentucky Street, near where he had just sold crack to Jones. Officers struggled with Winbush but ultimately subdued and arrested him. Police noticed that he was no longer wearing the stocking cap and distinctive black and white leather jacket that he had on when he fled his vehicle. Nor did Winbush possess a firearm. Winbush, however, did have $900 in cash, $200 of which

was photocopied money that police had provided Jones to consummate the staged drug buy.

Following footprints in the snow, police retraced their path of pursuit, particularly concerned with finding Winbush's firearm. They recovered much more. In the 2300 block of Tennessee Street, one block to the east of Kentucky Street, police recovered five clear knotted plastic bags containing what analysis later revealed to be 9.3 grams of crack cocaine (the "Tennessee crack"). In the 2300 block of Kentucky Street, they found Winbush's leather jacket, which contained a .40-caliber Ruger handgun and a plastic bag holding 20.2 grams of crack cocaine in fifty-two separate baggies (the "Kentucky crack"). Finally, near Winbush's vehicle, police found the stocking cap that he was wearing when he fled.

The second superseding indictment against Winbush[1] charged him with one count of distribution and one count of possession with the intent to distribute five grams or more of cocaine base, *see* 21 U.S.C. § 841(a)(1); possession with the intent to distribute marijuana, *see id.*; unlawful possession of a firearm by a felon, *see* 18 U.S.C. § 922(g)(1); and possession of a firearm in furtherance of a drug trafficking crime, *see id.* § 924(c).

After various pretrial motions and multiple continuances, the district court scheduled Winbush's trial for November 13, 2007. On October 3, 2007, the government

---

[1] The original indictment was filed May 19, 2005, followed by a superseding indictment on July 22, 2005, and the second superseding indictment on October 3, 2007.

filed its Notice of Expert Witnesses, which notified Winbush that the government planned to call, among others, Michael Shay, a forensics examiner with the Federal Bureau of Investigation; Deputy Commander Michael Reilly of the Lake County Police Department; and FBI Special Agent Mark Becker. The government indicated that Shay would testify "consistent with the lab reports that have been provided in discovery regarding the fingerprint analysis in this case," i.e., that no latent fingerprints of value where discovered on the physical evidence recovered from the scene of Winbush's arrest. Reilly would testify as a fingerprint expert "about the difficulties in obtaining latent fingerprints from different materials and surfaces." And Becker would testify as an expert regarding the "practices, methods and structure of narcotics trafficking."

At the final pretrial conference on November 2, 2007, the government and Winbush informed the magistrate judge that they would stipulate to Shay's testimony. The government also discussed the other expert testimony, and Winbush informed the magistrate judge that he would present no expert witnesses at trial.

On November 8, six days after the pretrial conference and only five days before trial, Winbush filed five additional motions. Among these were a Motion for Fingerprint Identification Expert and a Motion to Continue. Winbush requested a fingerprint expert "to examine the submitted items of physical evidence, and if no latent fingerprints are present, to testify as to its meaning." The magistrate judge denied this motion, stating that "on the

Friday before trial in a case that's been pending for over two years, the request . . . is just woefully late." The magistrate judge also denied Winbush's Motion to Continue, and the trial began on November 13, 2007.

At trial, the government introduced testimony from law enforcement involved in Winbush's investigation and arrest, as well as the expert testimony discussed above. The government read Shay's stipulated testimony: that "no latent prints of value were detected" on various pieces of physical evidence found at the scene of Winbush's arrest. The government then called Deputy Commander Reilly, who explained that the ability to recover latent prints often depends on a variety of factors, such as the weather and the surface of the item, and it would be possible for a person to touch something and leave no identifiable prints. Reilly stated that it is "probably more than the norm" to find no identifiable prints on a handgun. Finally, the government called Special Agent Becker, who testified about the methods and practices of drug traffickers. Specifically, Becker, who had no knowledge of the facts of Winbush's case, opined that possession of, respectively, 288 grams of marijuana, 9.5 grams of crack cocaine, and 20.2 grams of crack cocaine, indicated that the drugs were meant for distribution rather than personal use.

On November 15, 2007, the jury found Winbush guilty on all five counts. Prior to sentencing, a probation officer prepared a presentence investigation report (PSR), which recommended that Winbush be held accountable for 288 grams of marijuana and 35.3 grams of crack

cocaine—the sum of the 5.8 grams he sold to Jones, the 20.2 grams of "Kentucky crack," and the 9.3 grams of "Tennessee crack." The total marijuana equivalent of the drugs amounted to 402.708 kilograms, which resulted in a base offense level of twenty-eight. *See* United States Sentencing Guidelines Manual (U.S.S.G.) § 2D1.1(c)(6).

The probation officer also assigned Winbush eleven criminal history points, based in part on two prior Indiana drug convictions. In both instances, Winbush was sentenced to work release: in 1999, he received a one-year sentence, and in 2001, he received a three-and-one-half-year sentence. The PSR characterized these as sentences of "imprisonment" under U.S.S.G. § 4A1.1(a) and (b).

At sentencing, the district court adopted the PSR's calculations. Winbush did not object to the quantity of drugs attributable to him, nor to the criminal history calculation. The district court assigned a total offense level of twenty-eight and a criminal history category of V, resulting in a Guideline range of 130-162 months' imprisonment. The court sentenced Winbush to 140 months' imprisonment on the three drug possession and distribution counts, to run concurrently with a 120-month sentence for possessing a firearm as a felon. The court also sentenced Winbush to 84 months' imprisonment for possessing a firearm in furtherance of a drug trafficking offense, to run consecutively with his other sentences, giving Winbush a total sentence of 224 months.

Winbush now appeals both his conviction and his sentence. We find that the district court committed no error in either stage.

## II. ANALYSIS

Winbush raises three issues on appeal: (1) whether the district court erred by denying his motion to retain a fingerprint expert; (2) whether the court properly admitted Agent Becker's expert testimony; and (3) whether the court erred in calculating Winbush's base offense and criminal history levels. We address each issue separately.

### A. Fingerprint Expert

On November 8, 2007, five days before his trial was set to begin, Winbush filed a motion requesting funds for a fingerprint expert. The magistrate judge denied Winbush's motion as untimely, a decision that Winbush now claims was improper. We review for an abuse of discretion the district court's denial of Winbush's request for expert services, *see United States v. Smith*, 502 F.3d 680, 686 (7th Cir. 2007); *United States v. Daniels*, 64 F.3d 311, 315 (7th Cir. 1995), but we review for clear error a trial court's decision that a pretrial motion was untimely, *United States v. Salahuddin*, 509 F.3d 858, 860 (7th Cir. 2007). Not only was the court within its authority to deny Winbush's motion as untimely, but we find that a fingerprint expert was unnecessary for his defense.

*1. Timeliness*

To say that our trial courts are busy would be an understatement; we have frequently used the term "overburdened." *See, e.g.*, *United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000); *United States v. Wilson*, 73 F.3d 675, 701 (7th Cir. 1995) (Coffey, J., dissenting). As a result, " '[d]istrict court judges, because of the very nature of the duties and responsibilities accompanying their position, possess great authority to manage their caseload.' " *United States v. Coronado-Navarro*, 128 F.3d 568, 572 (7th Cir. 1997) (quoting *United States v. Reed*, 2 F.3d 1441, 1447 (7th Cir. 1993)). It is well settled that issues of trial management are left to the district judge, and "we intervene only when it is apparent that the judge has acted unreasonably. The occasions for intervention are rare." *Brooks v. United States*, 64 F.3d 251, 256 (7th Cir. 1995) (quotations omitted).

We first note that the district court had already granted Winbush significant leeway before he filed five pretrial motions on November 8, 2007. In his order denying Winbush's last Motion to Continue, the magistrate judge stated that the court had already granted Winbush *seven* continuances. The magistrate judge informed Winbush in its July 12, 2007, order granting an earlier continuance that "no further continuances [will] be granted in this matter absent extraordinary circumstances." Nevertheless, the magistrate judge granted another continuance on October 10, 2007, and set his trial date for November 13.

With this as context, a brief timeline reveals that the magistrate judge properly deemed Winbush's motion to be untimely. On October 3, 2007, the government filed

its Notice of Expert Witnesses. From then until the pretrial conference, the parties discussed possible stipulations regarding the government's expert witnesses, and at the pretrial conference on November 2, Winbush agreed to stipulate to Shay's testimony. Winbush informed the court that he would not present any expert testimony. On the afternoon of Thursday, November 8, only two business days before his trial was set to commence,[2] Winbush filed five motions, including his request for a fingerprint expert. The district court denied Winbush's motions before his trial began on Tuesday, November 13.

Winbush presented no good reason for his delay. On appeal, he claims that "the timing of [his] motion may have been a function of his learning, on the eve of trial, that he would not have the opportunity to cross-examine Shay, and therefore required his own expert." But Winbush *stipulated* to Shay's testimony at the pretrial conference on November 2, something he should not have done if he wanted to cross-examine Shay. Furthermore, Winbush's primary challenge on appeal is that he was unable to rebut Reilly's expert testimony, not Shay's, which merely stated that he found no fingerprints of value on the physical evidence. Winbush received notice of Reilly's testimony on October 3, more than a month before he filed his pretrial motions, yet he does not explain this delay.

Even more astounding is Winbush's claim that the government failed to provide adequate notice of the

---

[2] The court was closed for a federal holiday on Monday, November 12.

substance of its experts' testimony; he asserts that it is unclear from the record at what point the government knew the results of Shay's tests. But the government's October 3 Notice of Expert Witnesses stated that Shay would testify "consistent with the lab analysis reports *that have been provided in discovery* regarding the fingerprint analysis in this case" (emphasis added). Accordingly, Winbush had already received the lab reports revealing that no latent prints of value were found on the physical evidence. As for Reilly, the government's Notice expressly stated that he would testify "about the *difficulties* in obtaining latent fingerprints from different materials and surfaces" (emphasis added). We cannot fathom why Reilly would need to testify about such difficulties if Shay had discovered Winbush's prints on the evidence. The record is clear that Winbush received adequate notice of the government's proposed expert testimony on October 3.

Winbush had ample time between October 3 and November 8 to request funding for a fingerprint expert. We have no difficulty determining that the magistrate judge properly characterized his motion as "woefully late." But, even if it were timely, his motion faced a much higher hurdle.

### 2. Necessity of a Fingerprint Expert

In his motion for expert services, Winbush claimed that a fingerprint expert was necessary to examine the physical evidence, and, "if no latent fingerprints are present, to testify as to its meaning." On appeal, he asserts that, without such assistance, he was deprived

of "the opportunity to present his own interpretation of the absence of fingerprints on the evidence." Winbush's "interpretation" is quite simple: one reason that the government found no fingerprints on the evidence could be that he never touched it. But in this case an expert witness is not necessary to explain such an obvious possibility.

Under the Criminal Justice Act, an indigent defendant may request that the court provide him access to expert services that are "necessary for adequate representation." 18 U.S.C. § 3006A(e)(1). An expert's services are typically necessary if "'a reasonable attorney would engage such services for a client having the independent financial means to pay for them.'" *Smith*, 502 F.3d at 686 (quoting *United States v. Cravens*, 275 F.3d 637, 639 (7th Cir. 2001)). We have recognized, however, that this standard, if applied too literally, may require the government "to finance a 'fishing expedition.'" *United States v. King*, 356 F.3d 774, 778 (7th Cir. 2004); *see also Smith*, 502 F.3d at 686. Consequently, a district court should satisfy itself that the defendant has a plausible defense before granting a request for expert assistance. *Smith*, 502 F.3d at 686; *King*, 356 F.3d at 778; *United States v. Alden*, 767 F.2d 314, 318-19 (7th Cir. 1984).

Given the facts of this case, the district court did not abuse its discretion in denying Winbush's request for a fingerprint expert. Winbush had no plausible defense that would have rendered such an expert necessary. The evidence against him was overwhelming, and he needed no expert to explain that the absence of finger-

prints on the physical evidence could mean that he never touched that evidence. Not only is such a conclusion obvious, but Winbush could easily have elicited this information during Reilly's cross-examination. Indeed, Winbush's counsel asked Reilly about each piece of evidence and whether Reilly thought the absence of fingerprints was unusual.

Winbush also claims that the government's case "rest[ed] heavily on a theory most competently addressed by expert testimony," citing *United States v. Hardin*, 437 F.3d 463, 468 (5th Cir. 2006). We disagree. Although the *presence* of fingerprints is often central to a defendant's conviction, *see, e.g.*, *United States v. Patterson*, 724 F.2d 1128, 1130-31 (5th Cir. 1984), in this case Reilly's testimony explained the *absence* of finger-prints. This testimony was meant to overcome a fact favorable to Winbush and was in no way the crux of the government's case—a case that rested heavily on over-whelming evidence of Winbush's guilt, including testi-mony from multiple eyewitnesses and a glut of physical evidence found at the scene of Winbush's attempt to flee from police.

Finally, contrary to Winbush's argument, 18 U.S.C. § 3006A(e) did not require the district court to conduct an ex parte hearing before denying his motion. A district judge need not conduct such a hearing when the out-come is readily apparent. *See United States v. Daniels*, 64 F.3d 311, 315 (7th Cir. 1995) ("A defendant is not entitled to a hearing when he does not make even the barest of cases that an expert is necessary to his defense.").

Winbush never explained why expert analysis of the absence of fingerprints was necessary, and the magistrate judge could have easily determined that it was not. We find no error in the denial of Winbush's motion.

## B. *Special Agent Becker's Expert Testimony*

Next, Winbush asserts that the district court improperly admitted expert testimony from Special Agent Mark Becker. Winbush did not object to Becker's testimony at trial, and we therefore review the district court's admission of his testimony for plain error.[3] *See United States v. Recendiz*, 557 F.3d 511, 522 (7th Cir. 2009). We will reverse only if the error compromised the defendant's substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Blount*, 502 F.3d at 678.

---

[3] Winbush claims that he preserved his objection by filing a motion in limine to preclude testimony regarding his mental state, and thus our review should be for an abuse of discretion. *See United States v. Lee*, 558 F.3d 638, 648 n.4 (7th Cir. 2009). The district judge granted his motion, stating that the government's expert could not testify that Winbush actually intended to distribute illegal drugs, but he could testify generally about methods of operations in drug cases. Winbush now challenges Becker's testimony on grounds not raised in his motion in limine, and he therefore failed to preserve his objection. *See United States v. Blount*, 502 F.3d 674, 677-78 (7th Cir. 2007). Any further discussion is pointless, however, because Winbush's argument fails under either standard of review.

The government offered Becker's testimony to explain the practices and methods of drug trafficking, including the tools that drug dealers often use and the quantity, purity, and street value of illegal drugs typically possessed for distribution rather than individual use. Winbush argues that Becker's testimony violated Federal Rules of Evidence 702 and 704(b) because it contained irrelevant observations of drug dealer behavior and spoke to Winbush's actual intent to distribute narcotics. Because Becker's testimony was the only evidence of Winbush's mental state, he claims that the error in admitting it was prejudicial and now warrants reversal. We disagree.

### 1. Federal Rule of Evidence 702

Winbush's first challenge is that Agent Becker testified about attributes of drug trafficking that were irrelevant to his alleged conduct. Under Federal Rule of Evidence 702, a court may admit expert testimony if the witness is qualified and the testimony would be helpful to the trier of fact.[4] Our court has long recognized that testimony regarding the methods used by drug dealers is helpful to the jury and therefore a proper subject of expert testimony. *See United States v. Avila*, 557 F.3d 809, 820 (7th Cir. 2009); *United States v. Foster*, 939 F.2d 445, 451 & n.6 (7th Cir. 1991) (collecting cases).

---

[4] Winbush does not challenge Agent Becker's qualifications. We therefore focus solely on whether his testimony was helpful to the jury.

We have noted that "it is 'still a reasonable assumption that jurors are not well versed in the behavior of drug dealers,'" *United States v. Upton*, 512 F.3d 394, 401 (7th Cir. 2008) (quoting *Foster*, 939 F.2d at 452), and expert testimony is helpful in explaining why seemingly innocent activity may be significant in the context of a drug transaction, *see United States v. de Soto*, 885 F.2d 354, 360-61 (7th Cir. 1989).

We find no error in admitting Becker's testimony. Winbush is correct that not every piece of Becker's testimony applied directly to this case. But Becker's comments were general in nature, and he expressly stated during both direct and cross-examination that he knew nothing about Winbush's case. Furthermore, much of Becker's testimony that Winbush now challenges came in response to the government's foundational questions regarding his professional background and experience. For instance, he testified that he worked with a task force focused on stemming violent and gang-related crime in Gary. Contrary to Winbush's claims, this testimony came nowhere near the level of "gang affiliation evidence" that we found improper in *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996), in which the government introduced evidence that the defendant was a member of a motorcycle gang to show that he was more likely to have distributed drugs. Here, Becker never testified that Winbush was a member of a gang, nor did his testimony suggest it. In fact, he never mentioned Winbush's name during his testimony.

Likewise, Becker's testimony regarding crack cocaine production assisted the jury in understanding the

typical distinctions between a drug distributor and one who possesses crack for personal use. The government asked Becker directly, "What types of things do you look at when you go into a search or you arrest somebody and you find some controlled substances? What do you look at to determine whether that person . . . is dealing in that narcotic or merely possessing it for their personal use?" Becker replied by describing evidence that typically indicates a drug dealer, rather than a user: plastic baggies, scales, transaction logs, firearms, and ammunition. Becker also later explained that police often find baking soda and large amounts of cash.

Of course, we recognize the potential danger of undue prejudice that can result from expert testimony about the practices of drug dealers, *see Foster*, 939 F.2d at 452, but our independent review of the record assures us that Becker's testimony stayed within the bounds of Rule 702. And even if Becker strayed slightly into forbidden territory, any error in admitting irrelevant testimony did not prejudice Winbush. As we have already noted, the evidence of Winbush's guilt was overwhelming.

### 2. *Federal Rule of Evidence 704(b)*

Winbush's argument that Becker's testimony violated Rule 704(b) suffers a similar fate. He argues that the testimony's "extreme over-inclusiveness was, for all intents and purposes, tantamount to stating an opinion or inference that Winbush" intended to distribute narcotics. We find nothing in Becker's testimony to support such a conclusion.

For Winbush's charged offenses under 21 U.S.C. § 841(a)(1), the government bore the burden of proving that he intended to distribute controlled substances. Direct evidence of such intent is predictably rare, so the government often employs expert testimony. *Foster*, 939 F.2d at 451 & n.6 (collecting cases and noting that our circuit "is quite familiar with the use during trial of expert testimony as to the methods used by drug dealers"). But Rule 704(b) imposes limits on expert testimony regarding a defendant's mental state—an expert may not testify to "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged." Fed. R. Evid. 704(b); *see also United States v. Mancillas*, 183 F.3d 682, 705 (7th Cir. 1999).

Although an expert may not testify or opine that the defendant actually possessed the requisite mental state, he may testify in general terms about facts or circumstances from which a jury might infer that the defendant intended to distribute drugs. *See Mancillas*, 183 F.3d at 706; *United States v. Lipscomb*, 14 F.3d 1236, 1239-40 (7th Cir. 1994); *United States v. Brown*, 7 F.3d 648, 654 (7th Cir. 1993). Such testimony is properly admitted as long as it is clear "'that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes.'" *Mancillas*, 183 F.3d at 706 (quoting *Lipscomb*, 14 F.3d at 1242). An important factor in determining whether an expert violated Rule 704(b) is the degree to which the expert refers to the specific defendant's intent, *id.*, and expert testimony is proper as long as it

leaves for the jury the ultimate conclusion that the defendant intended to distribute controlled substances, *see Lipscomb*, 14 F.3d at 1240; *Brown*, 7 F.3d at 654.

Becker's testimony did not violate Rule 704(b). Most importantly, Becker never mentioned, or even alluded to, Winbush's actual intent to distribute drugs. To the contrary, he told the jury on multiple occasions that he was unfamiliar with this case. His testimony focused exclusively on his knowledge of common criminal practices, and he addressed facts presented by the government that helped the jury distinguish a drug distributor from a user. For example, he testified, without reference to Winbush, that possession of 9.5 grams of crack cocaine suggests an intent to distribute the drugs: "[I]n my experience, I've never come across a user on the street who had almost ten grams of crack cocaine in their possession. That, from my perspective, would be someone who we would want to investigate as a trafficker." When asked about possession of 20.2 grams of crack, packaged in fifty-two separate bags, he replied, "[T]hat is distribution level. That is not user level." We have upheld the use of hypothetical drug quantities during similar expert testimony, *see, e.g.*, *Mancillas*, 183 F.3d at 705-06 (upholding statement by expert witness that 400 grams of marijuana, found in a plastic bag, was likely being held for distribution), and we see no error in Becker's testimony.

Even Winbush cannot point to a direct statement of his intent in Becker's testimony; instead, he argues that Becker's testimony "created the impression that Winbush was a drug dealer." Of course Becker's testimony created

the *impression* that Winbush was a drug dealer. There is nothing improper about creating such an impression, and that is precisely why the government elicited this testimony. Becker stopped short, however, of crossing the line that Rule 704(b) draws, and the court properly admitted the testimony.

### C. Sentencing Challenges

Finally, Winbush challenges his sentence on two separate grounds: that the district court improperly calculated (1) the quantities of drugs attributable to him, and (2) his criminal history level. We review the court's factual determinations, including the amount of drugs attributable to the defendant, for clear error. *United States v. Strode*, 552 F.3d 630, 633 (7th Cir. 2009); *United States v. Krasinski*, 545 F.3d 546, 551 (7th Cir. 2008). A factual finding is clearly erroneous if "we are left with a definite and firm conviction that a mistake has been committed." *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008) (quotations omitted). We review *de novo* the district court's application of the United States Sentencing Guidelines. *Id.* at 837. We find both of Winbush's arguments unpersuasive.

### 1. Drug Quantity Calculation

We can dismiss Winbush's first argument relatively quickly. The district court accepted the PSR's recommendation that Winbush be held responsible for 288 grams of marijuana and 35.3 net grams of cocaine base—the sum

of the 9.3 grams of "Tennessee crack," the 20.2 grams of "Kentucky crack," and the 5.8 grams of crack he sold to Jones. Winbush claims that the district court erred by including in his base offense level the 9.3 grams of "Tennessee crack" and the 288 grams of marijuana because these drugs involved unrelated, uncharged conduct. *See* U.S.S.G. § 1B1.3(a)(2).

First, Winbush did not object to the probation officer's drug quantity calculations, nor did he challenge the base offense level imposed by the district court. In the absence of an objection, a district court may typically rely on a probation officer's recommendations in a PSR. *See United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007) ("When the court relies on information contained in the PSR at sentencing, it is the defendant's burden to show that the PSR is inaccurate or unreliable. When a defendant has failed to produce any evidence calling the report's accuracy into question, a district court may rely entirely on the PSR." (citations and quotations omitted)).

Second, Winbush characterizes his challenge as one involving "uncharged or unconvicted relevant conduct," but, unlike the cases he cites, he *was* charged for possessing, with the intent to distribute, the drugs that formed the basis of his sentence. Specifically, the indictment included a separate count charging Winbush with possessing with the intent to distribute marijuana, which covers the 288 grams the district court attributed to him. The indictment also charged him with possessing with the intent to distribute more than five grams of crack cocaine,

which presumably included both the "Tennessee crack" and the "Kentucky crack." The government and its witnesses referred to both drug quantities and their aggregated weight during the trial and closing argument. Winbush never objected to these comments, nor did he present evidence or argue that the quantities were separate from those included in the indictment.

Winbush now argues that either quantity of crack, alone, would have satisfied the charge in the indictment, and it is therefore impossible to determine which amount formed the basis of his conviction. Even if we accept his contention, however, the "Tennessee crack" would have qualified as related conduct. *See* U.S.S.G. § 1B1.3(a)(2). In sentencing, the district court may consider a defendant's conduct that was "part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* An offense is part of the "same course of conduct" as another if it was "sufficiently connected or related to [the] other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3(a)(2) cmt. n.9. Although we typically require the district court to state its reasons for finding that unconvicted activities were related to the offense of conviction, we have upheld a court's decision to include unconvicted conduct even without express findings when "it is clear that the district court took into consideration and adopted the facts contained in the presentence report." *United States v. Panaigua-Verdugo*, 537 F.3d 722, 726 (7th Cir. 2008).

It was clear from the facts of this case, including those articulated in the PSR and adopted by the district court,

that possession of the "Tennessee crack" was "part of the same course of conduct" as Winbush's offenses of conviction. Police found the "Tennessee crack" in the same vicinity as the other evidence in this case; it was packaged in five separate plastic bags; and Winbush presented no evidence that it was not intended for distribution or was otherwise separate from the rest of the drugs. We find no clear error in the district court's calculation of Winbush's base offense level.

### 2. Criminal History Calculation

Winbush also claims that the district court erred in calculating his criminal history level. The court adopted the probation officer's recommendation that Winbush receive eleven criminal history points. This included two points for a 1999 state conviction for possession of cocaine, for which Winbush was sentenced to one year of work release, and three points for a 2001 state conviction for possession of controlled substances, for which he was sentenced to three-and-one-half years of work release. Winbush claims that neither of the prior work release sentences was "imprisonment" under U.S.S.G. § 4A1.1.

The Sentencing Guidelines assign three criminal history points for a prior sentence of imprisonment exceeding one year and one month, U.S.S.G. § 4A1.1(a), two points for a prior sentence of imprisonment of at least sixty days, *id.* § 4A1.1(b), and only one point for any other prior sentence, *id.* § 4A1.1(c). The Guidelines do not provide a detailed definition of "imprisonment,"

stating only that it means "a sentence of incarceration." *Id.* § 4A1.2(b)(1).

We have noted that an important factor in determining whether a sentence is one "of imprisonment" is the extent to which the defendant was physically confined. *See United States v. Timbrook*, 290 F.3d 957, 959 (7th Cir. 2002); *see also United States v. Morgan*, 390 F.3d 1072, 1074 (8th Cir. 2004) ("Physical confinement without being free to leave is a key factor in determining whether a sentence is one of incarceration."). In *Timbrook*, we held that a prior sentence of work release in a county jail was a "sentence of imprisonment" under § 4A1.1. 290 F.3d at 959. We noted that the defendant was sentenced to a secure facility and locked up when not at work, unlike time served at a community treatment center or a halfway house. *Id.* at 960 ("A community confinement center or a halfway house is not a 'secure jail facility' almost by definition. 'Houses' and 'Treatment Centers' are not supposed to be jails."). Because work release in a county jail "is more akin to confinement in a conventional prison facility," we concluded that it qualified as a sentence of imprisonment. *Id.* Ours and other courts have held that sentences similar to work release qualify as "imprisonment" under § 4A1.1. *See Morgan*, 390 F.3d at 1074 ("violator's facility"); *United States v. Gajdik*, 292 F.3d 555, 558 (7th Cir. 2002) ("boot-camp style program"); *United States v. Brooks*, 166 F.3d 723, 726 (5th Cir. 1999) (boot camp); *United States v. Allen*, 64 F.3d 411, 412-13 (8th Cir. 1995) (juvenile training school); *United States v. Ruffin*, 40 F.3d 1296, 1299 (D.C. Cir. 1994) (one-year work release).

As with his base offense level, Winbush failed to object to both the probation officer's calculation of his criminal history level and the district court's adoption of it. By raising this issue for the first time on appeal, the district court had no occasion to examine the conditions of Winbush's prior sentences, and Winbush faces an uphill battle to demonstrate that the court clearly erred by characterizing his sentences as "imprisonment."

In 1999, Winbush was sentenced to one year of work release with the Lake County Sheriff's Work Release Program. Winbush relies on a description of the Program found on Lake County's website and a newspaper article indicating that the Program is housed in a former hospital—neither of which are in the record itself. This is well short of what would be necessary to establish that a defendant sentenced to this Program is free to leave, that the facility is not secure, or that the Program is more akin to a halfway house than a prison.[5] Winbush has not established that the district court clearly erred by assigning two points for his 1999 sentence.

_____

[5] Furthermore, the government refers us to the website of the Lake County Sheriff's Department. *See* http://www.lakecountysheriff.com. The site states that the Program was established "to help reduce the population of the Lake County Jail and offset the cost of incarceration by placing non-violent, low-risk offenders in a secured work release facility." *Id.* (follow "Corrections/Jail" hyperlink; then follow "Work Release" hyperlink). Only low-risk offenders "sentenced to the Lake County Jail" and who are deemed eligible may participate. *Id.*

In 2001, Winbush was sentenced to three-and-one-half years with the Indiana Department of Corrections Work Release Program. As with his 1999 sentence, Winbush has failed to produce any evidence that this Program is not secure, that he is free to leave, or that it is otherwise similar to a halfway house or community treatment center. Winbush therefore has not shown that the district court clearly erred by assigning three points for his 2001 work release sentence with the Indiana Department of Corrections.

Because the district court properly calculated Winbush's base offense level and his criminal history level, its sentence was proper and must stand.

### III. CONCLUSION

We find no error in Winbush's conviction or sentence, and we AFFIRM both.